# AFFIDAVIT OF GEORGE RAMIREZ SPECIAL AGENT OF THE U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

## TABLE OF CONTENTS


**Page**

I. Introduction 3

II. Overview of Investigation 6

III. Investigation Conducted To Date 50

A. Confidential Informants 50

B. Surveillance Operations 50

IV. Probable Cause For Arrest and Search Warrants:

A. Arrest of Daniel TOTOSAUS-Rodriguez, aka: "**CHILANGO**", Alberto MORALES
Search of:
1. Workspace and Locker of Daniel TOTOSAUS-Rodriguez located within the Pilgrim's Pride Chicken Processing Facility, 1107 Monticello Road, Mount Pleasant, Texas; and
2. Residence at 2201 N. Edwards # 108, Mount Pleasant, Texas
3. Ford Escape Sport Utility Vehicle, Texas License plate 9HC JO1 **51**

B. Arrest of Marcos GARCIA, aka: "**MARCOS**" **52**

C. Arrest of Ivan Damaso aka: "**FETCH**"
Search of:
1. Workspace and Locker of Ivan Damaso, aka: "**FETCH**," located within the Pilgrim's Pride Facility, 1107 Monticello Road, Mount Pleasant, Texas; and
2. Residence at 6096 Highway 271, Mount Pleasant, Texas
3. One Gold Lincoln, Texas License Plate X03-NZS **52**

D. Arrest of Jose Luis GARCIA **53**

E. Arrest of Reyna VILLARREAL, aka: Reyna Aleman, Reyna A. Castro
Search of:
1. Workspace and Locker of Reyna VILLARREAL located within

the Pilgrim's Pride Human Resource Division, 1107 Monticello Road, Mount Pleasant, Texas **53**

V. Probable Cause For Identity Theft Arrest Warrants:

**Jane DOE, aka: ALDAPE, ARACELI**, dob: 09/21/1977
**Jane, DOE, aka: MELENDEZ, IGXILA, DIAZ, Ecia**, dob: 05/13/1978
**Jane DOE, aka: RAMOS, MERCEDES**, dob: 07/30/1966
**John DOE, aka: ESCALANTE, CARLOS**, dob: 1/11/1967
**John DOE, aka: IVAN DAMASO; aka "FETCH"**, dob: 09/06/1978
**John DOE, aka: BLANQUET, MANUEL**, dob: 12/26/1983
**John DOE, aka: BEDOLLA, YOSERIN**, dob: 9/25/1983
**John DOE, aka: ALCON, RONNIE**, dob: 11/01/1970
**Jane DOE, aka: CHAVEZ, NORMA**, dob: 03/09/1982
**John DOE, aka: RAMIREZ, ARTURO**, dob: 04/08/1983
**John DOE, aka: LEARY, JESSIE C.**, dob: 12/12/1984
**John DOE, aka: QUEZADA, OSCAR**, dob: 07/10/1983
**John DOE, aka: RODRIGUEZ, RENE**, dob: 05/02/1954
**John DOE, aka: ESPINOZA, GUILLERMO**, dob: 05/15/1971
**John DOE, aka: HEREDIA, JUAN**, dob: 12/31/1964
**Jane DOE, aka: PEREZ, TANIA**, dob: 04/28/1968
**John DOE, aka: JIMENEZ, BENJAMIN**, dob: 09/14/1973
**John DOE, aka: PEREZ, JULIO**, dob: 04/12/1976
**John DOE, aka: ANSELMO, SERGIO**, dob: 3/27/1981
**John DOE, aka: LOPEZ, JOHN**, dob: 01/30/1982
**Jane DOE, aka: ALVARENGA, EMERITA**, dob: 02/27/1976
**Jane DOE, aka: RIVERA, VIRGINIA**, dob: 10/09/1983
**John DOE, aka: BARILLAS, OSCAR JR.**, dob: 02/01/1986
**John DOE, aka: AGUILAR, LAZARO**, dob: 06/27/1975
**Jane DOE, aka: TREVINO, ROSE**, dob: 09/28/1984
**John DOE, aka: GONZALEZ, MOISES**, dob: 08/07/1980 **53**

VI. Pen Register Information **67**

VII. Conclusion **69**

## AFFIDAVIT

## I. INTRODUCTION

I, George Ramirez, Senior Special Agent ("SSA") of the U.S. Immigration and Customs

Enforcement ("ICE"), Irving, Texas, hereinafter referred to as Affiant, being duly sworn, do depose and state the following:

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, I am an officer of the United States, who is authorized by law to conduct investigations of and make arrest for offenses enumerated in Sections 371, 1028, and 1546 of Title 18, United States Code, among others.

2. I am a SSA with the ICE and have been so employed for more than 22 years. During my law enforcement career I have participated in the investigations of numerous crimes, including complex drug organizations, alien smuggling organizations, and domestic and international terrorism. In my current position I have often acted in an undercover capacity in alien smuggling, fraud, and narcotics cases. I have also participated in all of the traditional methods of investigations, including, but not limited to, electronic surveillance, physical surveillance, witness and subject interviews, the use of search warrants, the use of confidential informants, the use of pen registers, and the use of undercover agents. In the course of such investigations, I have made numerous arrests.

3. Through training and participation in a multitude of criminal investigations, I have been the Affiant in numerous affidavits in support of criminal complaints and search warrants. I have supervised the activities of informants who have provided information and assistance resulting in federal prosecution of criminal offenders. I have also acted in and supervised numerous domestic and international undercover operations on behalf of ICE.

4. Information afforded Affiant from the debriefings of individuals connected to this investigation, confidential informants, and other sources knowledgeable about Daniel TOTOSAUS-

Rodriguez, aka "**CHILANGO**" (hereinafter "**CHILANGO**"), and his co-conspirators, as well as a wealth of information gleaned from numerous surveillance operations, and discussions with the many law enforcement personnel assigned to this investigation, including undercover agents, have provided Affiant with a significant understanding of **"CHILANGO"** and his co-conspirators and their involvement in a counterfeit document vending scheme. Based on Affiant's training, experience, and participation in this investigation, Affiant believes that, on the basis of the entire contents of this Affidavit, there is probable cause for the issuance of arrest warrants for the persons described herein and search warrants for the premises described herein, for the purpose of seizure of physical evidence related to the federal offenses identified herein. Furthermore, Affiant knows that:

A. Illicit counterfeit document vendors often maintain, in their businesses, residences, and automobiles, books, records, receipts, notes, ledgers, computers and computer disks, airline tickets, money orders, cashier's check receipts, photographs, and other papers relating to the transportation of, and monetary transactions executed with or for illegal aliens;

B. It is common for counterfeit document vendors to secrete records of counterfeit document transactions in secure locations within their residences, businesses, automobiles, safe deposit boxes, safes, vaults, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., to conceal them from other counterfeit document vendors and law enforcement;

C. When counterfeit document vendors collect proceeds from the sale of counterfeit documents they often attempt to legitimize these profits. Affiant knows that to accomplish this goal, counterfeit document vendors sometimes use foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit,

brokerage houses, trusts, partnerships, shell corporations and business fronts;

D. Counterfeit document vendors commonly maintain, in their businesses, residences, and automobiles, addresses or telephone numbers in books or papers which reflect the names, addresses and telephone numbers for their associates in the document vending organization; and

E. Counterfeit document vendors involved in the exploitation of undocumented aliens seeking employment often keep, at their businesses, residences and automobiles, paper records of the service transactions completed by the victim aliens on their behalf, e.g., ledgers, notes, tickets, ticket stubs, and I.O.U.s.

5. This affidavit is being used to support arrest warrants on the persons listed herein and search warrants for the locations and automobiles listed herein. Full descriptions of the locations to be searched are listed in an attachment to each search warrant as, "**Attachment A**."

6. As a result of Affiant's personal participation in this investigation and based upon oral and written reports supplied to Affiant by other Special Agents of ICE; U.S. Department of Labor/Office of Inspector General ("OIG"); Texas Workforce Commission ("TWC"); confidential informant information; Undercover Agent ("UCA") information; and subsequent investigation by the Agents and Officers involved in this investigation, I am familiar with the facts, circumstances, and offenses described in this Affidavit. However, Affiant has not included each and every fact known to Affiant concerning this investigation. Affiant has set forth only the facts that Affiant believes are essential to establish the probable cause foundation for the issuance of arrest warrants on the persons described herein and search warrants for the automobiles and premises described herein for the purpose of the seizure of physical evidence of the offenses referenced herein.

## II. OVERVIEW OF INVESTIGATION

7. On or about March 2, 2007, Dallas ICE agents received leads from the ICE Law Enforcement Support Center ("LESC") pertaining to complaints of the employment of undocumented foreign nationals. During a period between 2005 to the present, the LESC has received approximately seventy-six calls related to the unlawful employment of undocumented workers at various sites throughout the U.S., all of which are owned and operated by the Pilgrim's Pride Corporation ("Pilgrim's Pride"). A review of those leads was conducted and a total of fourteen (14) suspected Pilgrim's Pride Human Resource ("HR") employees were reported as being suspected of knowingly hiring undocumented aliens.

8. In April 2007, ICE investigators identified two document vendors, **Marcos GARCIA (hereinafter "MARCOS")** and **"CHILANGO,"** in Mount Pleasant, Texas, who have procured fraudulent documents for an ICE confidential informant to gain employment with Pilgrim's Pride.

9. On or about April 20, 2007, the Confidential Informant (hereinafter "**CI**") was outside a laundry establishment when he encountered a man named **"MARCOS."** "MARCOS" told the CI that he currently has a connection with a foreman at Pilgrim's Pride who could provide the CI with a job at the company. The CI informed **"MARCOS"** that he did not have immigration papers and that he had been banned from the United States for life. **"MARCOS"** told the CI that he could still get him a job at Pilgrim's Pride, and that he (**"MARCOS"**) could get immigration papers and the identification documents needed to obtain a job at Pilgrim's Pride. **"MARCOS"** stated to the CI that the cost for obtaining a valid Social Security card and immigration documents would be $600.00 (in addition to a $200.00 finder's fee for

**"MARCOS")**. **"MARCOS"** provided the CI with phone number **(903) 434-0122** for contact purposes.

10. On April 24, 2007, the CI had a conversation with **"MARCOS"** where the CI was advised that the total cost for the fraudulent documents, which could be utilized to obtain employment at the Pilgrim's Pride Plant, had gone up to $900.00 including the finder's fee. **"MARCOS"** told the CI that living arrangements could be coordinated with another worker in the Pilgrim's Pride plant if the CI needed a place to live. The CI advised "**MARCOS**" that several of the CI's acquaintances in California were in need of jobs as well. "**MARCOS**" conveyed that he was interested and posed no opposition to assisting additional individuals to obtain fraudulent identity documents, as well as jobs at Pilgrim's Pride.

11. On May 3, 2007, ICE Agents and the CI placed a consensually monitored undercover phone call to "**MARCOS**" at **(903) 434-0122** regarding the purchase of counterfeit documents. Initial arrangements were made to purchase documents for $900 in addition to a $200 finder's fee for "**MARCOS**." The CI and "**MARCOS**" also spoke about getting photos, which could be used for the identification documents, to an unidentified man who needed photographs for the completion of all of the fraudulent documents. **"MARCOS"** stated to the CI that he would arrange for a meeting to introduce the CI to the foreman at the Pilgrim's Pride Plant for the purpose of a job. The CI discussed the topic of obtaining fraudulent documents and jobs at Pilgrim's Pride for several friends and attempted to negotiate a better price for the fraudulent documents if additional referrals were brought to "**MARCOS**." "**MARCOS**" responded that he would check on the possibility of lowering the price.

12. On May 3, 2007, the CI arrived in Mount Pleasant, Texas, and met with "**MARCOS**" at the Wal-Mart located at 2311 South Jefferson Street, Mount Pleasant, Texas. "**MARCOS**" engaged in conversation with the CI pertaining to the procurement of fraudulent documents, employment at the Pilgrim's Pride processing plant, and the living arrangements for the CI with a friend of "**MARCOS.**" "**MARCOS**" advised the CI that he would obtain a "good" Social Security Account Number ("SSAN") and an identification document, and that all of the fraudulent documents would be from California. "**MARCOS**" informed the CI that the papers from California are usually from people who are incarcerated. "**MARCOS**" informed the CI that if the SSAN and identification were already being used by someone at the Pilgrim's Plant, another set of documents would be provided at no additional cost. "**MARCOS**" proceeded to take the CI to the Pilgrim's Pride Plant in Mount Pleasant, Texas, where "**MARCOS**" entered the facility to meet the friend.

13. On May 3, 2007, after leaving the Pilgrim's Pride Plant, the CI and "**MARCOS**" proceeded to an apartment located at **2201 North Edwards, Apartment 108, Mount Pleasant, Texas** (this apartment was identified by the CI as the apartment of "**CHILANGO**"). "**MARCOS**" introduced the CI to a Hispanic male by the name of Daniel Totosaus aka: "**CHILANGO**." "**MARCOS,**" "**CHILANGO,**" and the CI then engaged in a conversation regarding the rental of a room from "**CHILANGO.**" The CI paid "**CHILANGO**" $200.00 for rent and food. "**CHILANGO**" reassured the CI that the fraudulent documents which were to be provided were "good" because they were from the same person from whom he ("**CHILANGO**") had previously obtained counterfeit documents. "**CHILANGO**" told the CI that he ("**CHILANGO**") had been working with his documents at Pilgrim's Pride for about one year

under the name of "**Alberto MORALES.**" "**CHILANGO**" proceeded to show the CI his identification card from Pilgrim's Pride in the name of **Alberto MORALES**. **"CHILANGO"** provided the CI with the address of **2201 N. Edwards Ave #108, Mount Pleasant, Texas 75455** and phone number **903-767-8860**. "CHILANGO" identified his vehicle to the CI as a **primer-gray colored Jeep, Texas License Plate 08M-VT4.**

14. On May 4, 2007, the CI met with **"CHILANGO"** and the two discussed employment at the Pilgrim's Pride plant. **"CHILANGO"** stated to the CI that he was going to meet with someone in order to discuss obtaining the CI a "better" job at Pilgrim's Pride.

15. On May 4, 2007, an undercover operation was conducted where the CI provided money ($1,100) and passport photos to "**MARCOS**" for the purpose of procuring counterfeit documents to be used to gain employment at Pilgrim's Pride. The CI met with "**MARCOS**" at the Oak Manor Apartment Complex located at **2201 North Edwards Avenue, Mount Pleasant, Texas.** **"MARCOS"** and the CI drove into the downtown Mount Pleasant area to a business named "Rony's," where the CI was instructed to purchase photographs for the fraudulent documents. "**MARCOS**" and the CI drove to a residential home located at **404 North Church Street, Mount Pleasant, Texas**. Observed at the residence was a **white Lincoln automobile, Texas License Plate P77-FDN.** **"MARCOS** stated that the residence was the home of **"FRENCHI," aka "FETCH,"** who was the individual responsible for the production of the fraudulent identity documents used to gain employment at the Pilgrim's Pride plant.

16. On May 4, 2007, the CI provided "**MARCOS**" with $500.00 in cash for the purchase of the fraudulent documents as previously agreed, with the additional $400.00 payment

due upon receipt of the documents. "**FETCH**" was not at home at the time when the CI and "**MARCOS**" arrived. "**MARCOS**" made a phone call to "**FETCH**", and he **("MARCOS")** was instructed to take the photographs and the money to a man named "**LUIS,**" who was currently on shift at the Pilgrim's Pride Plant. During this undercover meeting, "**MARCOS**" took the CI to the Pilgrim's Pride Plant where "**MARCOS"** met with "**LUIS"** inside the plant for final payment for the documents, while the CI waited outside. Upon arriving at the Pilgrim's Pride Plant, "**MARCOS**" requested the additional $400.00 for the fraudulent documents and the other $100.00 for the finder's fee. The CI paid **"MARCOS"** the remaining balance of $500 as requested.

17. Texas Department of Public Safety computer indices (ID #17662154) revealed that a man named "Jose Luis Garcia," **("GARCIA,"),** with a dob: 07/16/1965, was photographed for his TX ID document on 01/17/2002 and listed his residence as **404 Church Street, Mount Pleasant, Texas 75455.** Lexis Nexis records indicate that "Jose Louis Garcia," dob 07/16/1965, is the registered owner of the residence at **404 Church Street**. ICE records indicate that a "**Jose Luis Garcia-Vasquez,"** dob: 07/16/1965 was encountered by U.S. Immigration Inspectors on 08/02/2001 at the Laredo, Texas, Port of Entry. **Garcia-Vasquez** was excluded from entry into the United States and returned to Mexico for violation of Immigrant without a visa.

18. ICE records indicate that during the attempted entry in to the U.S., **Garcia-Vasquez** presented a counterfeit non-immigrant visa and Mexican passport with a substituted biographical page. ICE Enforce records revealed that **Garcia-Vasquez** was photographed during the encounter on 08/03/2001. A comparison of the driver's license photograph of **"GARCIA"** and the photograph of Garcia-Vasquez indicated that the individual in each photograph appears

to be the same person with similar likeness and the same mole on the right cheek. At the time of the apprehension of **Garcia-Vasquez,** he was in possession of a Texas Identification Card (TX ID #17662154) in the name of Jose Luis GARCIA, expiring on 07/16/01. According to Texas Department of Public Safety records **"GARCIA"** was photographed for a renewal of his Texas Identification Card on 01/17/02. Affiant has reviewed that photograph and determined that it appears to be the same individual as in the photographs referenced above. In addition, ICE agents, as related hereinafter in this affidavit, observed the same individual on November 28, 2007, at the residence at 404 Church Street. Affiant believes, therefore, that **"GARCIA"** and **Garcia-Vasquez** are the same individuals. According to ICE records **"GARCIA"** was served with an I-296 (Notice to Alien Ordered Removed/Deported Verified) on August 02, 2001 by Immigration Special Operations Inspector Armando Santos. **"GARCIA"** was also served with a form I-860 (Notice and Order of Expedited Removal) signed by Immigration Assistant Port Director Conrado Serna, Jr., and informing **"GARCIA"** that he is inadmissible to the United States under Section 212(a)(7)(A)(i)(II). ICE records do not indicate that **"GARCIA"** has been inspected nor admitted by an immigration officer of the United States indicating that **"GARCIA"** is currently illegally residing in the United States. All record checks indicate that **"GARCIA"** returned to the United States after his exclusion in 2001 and is subject to criminal prosecution under 8 USC 1326(a)(2).

19. On May 5, 2007, the CI continued in-person negotiations with **"CHILANGO"** and "Marcos Garcia" concerning the procurement of fraudulent identity documents and a job at the Pilgrim's Pride Plant in Mount Pleasant, Texas. **"CHILANGO"** made numerous statements to the CI concerning **"CHILANGO's"** involvement in narcotics organizations in Mexico.

CHILANGO stated to the CI that he has worked as a narcotics organization "collector," and was involved in collecting money for narcotics dealers. CHILANGO also mentioned that he had been previously involved in a shooting and showed several bullet wounds in and around his abdomen to the CI. The CI identified **"MARCOS"** as driving a **2000 White Suburban Sport Utility vehicle, Texas License Plate 62M XJ3.**

20. On May 7, 2007, the CI telephoned "**MARCOS**" for the purpose of checking on the status of the counterfeit documents previously ordered from **"MARCOS." "MARCOS"** informed the CI that he **("MARCOS")** would contact his document vending associate and verify the status of the counterfeit documents. Surveillance activities at **404 Church Street, Mount Pleasant, Texas** revealed that **"MARCOS"** was observed at the residence in a **Red Dodge Durango, Texas License Plate 157-MKF,** apparently checking on the status of the documents as mentioned telephonically to the CI.

21. On May 8, 2007, the CI continued negotiations with **"CHILANGO"** at **"CHILANGO's"** residence located at **2201 N. Edwards #108 Mount Pleasant, Texas** concerning the purchase of fraudulent identity documents. During this meeting, "**CHILANGO**" picked up the land line telephone **(903) 577-8297,** located at this apartment at **2201 North Edwards Ave, Apt. 108, Mount Pleasant, Texas**, and made a phone call to suspected document vendor "**FETCH**" at **(903) 575-1380.** The CI overheard **"CHILANGO"** during **"CHILANGO'S"** phone conversation with "**FETCH,**" that "**FETCH**" told "**CHILANGO" that** the fraudulent documents are shipped from California in the amount of three or four at a time. "**FETCH**" then told **"CHILANGO"** that the fraudulent documents may be arriving no later than Monday, May 14, 2007. After the phone call, **"CHILANGO"** excused himself to the bathroom

and left a piece of paper listing the name, **"FETCH,"** and the number dialed for **"FETCH."** The CI was able to copy the number during the time that **"CHILANGO"** was out of the room. **"CHILANGO"** returned to the room and subsequently pulled out a black suitcase from the closet in his bedroom. This suitcase contained a birth certificate and Social Security Card for "**ALBERTO MORALES**" from California. **"CHILANGO"** showed the CI additional counterfeit "green cards" and identification documents and stated that he had used the other "fake" documents in the past.

22. On May 8, 2007, the CI and "**CHILANGO"** went to the **Pilgrim's Pride Plant to the Office of Human Resources**. Upon arriving at the Office of Human Resources, the CI was introduced by **"CHILANGO"** to Veronica CARDENAS who provided the CI with an employment application. **"CHILANGO"** went further back into an **Office within the area of Human Resources** to discuss potential job possibilities for the CI with an unknown person. Several minutes later, **"CHILANGO"** called the CI into the same office and introduced the CI to **Pilgrim's Pride Human Resources employee "Reyna VILLARREAL,"** hereinafter **"VILLARREAL."** Discussions were held regarding vacancies within the company and a potential job position within the Security Department. **"CHILANGO"** began discussing with "**VILLAREAL"** that the CI wants a "good" job at the Pilgrim's Pride Plant. After the discussion, **"CHILANGO"** gave the CI a look, indicating for him to leave. The CI left the room while **"CHILANGO"** stayed to speak with **"VILLAREAL"** for several more minutes. **"CHILANGO"** came out of the office and told the CI that "with money, everything is possible." The CI learned from **"MARCOS"** that he (**"MARCOS"**) is married and that his wife is the niece of **"VILLARREAL,"** who is employed within the Human Resources Division at the

Pilgrim's Pride Plant.

23. On May 9, 2007, the CI was informed by **"CHILANGO"** of additional counterfeit documents available for purchase, which could not be used to gain employment within Pilgrim's Pride. The CI was informed that the reason the documents could not be used was that the SSAN had previously been used within the Pilgrim's Pride Plant. **"CHILANGO"** temporarily provided the CI with a set of fraudulent documents under the name of Martin Fabien IZQUIERDO as a sample of the quality of the documents which could be shown to an "interested individual" for purchase. During this conversation it was revealed that **"CHILANGO"** wanted $1,000 for the set of counterfeit documents that included a U.S. birth certificate and SS card. **"CHILANGO"** also discussed his ability to obtain additional counterfeit documents, which could be used for employment at Pilgrim's Pride.

24. On May 9, 2007, the CI placed a phone call to **"CHILANGO's"** residence located at **2201 N. Edwards # 208, Mount Pleasant, Texas,** telephone number of **(903) 577-8297,** and began a discussion with **"CHILANGO"** about the purchase of fraudulent documents. The CI and **"CHILANGO"** also discussed the sample fraudulent documents provided to the CI in the name of Martin Fabian IZQUIERDO. **"CHILANGO"** again stated that the purchase price for the documents was $1,000.00. **"CHILANGO"** spoke with the CI about obtaining fraudulent documents for several friends of the CI and said that he could make arrangements for the fraudulent papers through **"FETCH."** The purchase price for fraudulent documents through **"FETCH"** would be $1,200.00, which would include the $200.00 finder's fee payment to **"CHILANGO."**

25. On May 11, 2007, an undercover operation was conducted at a warehouse in Fort

Worth, Texas, where an ICE Undercover Agent D. Ramirez (SAN)1 (hereinafter "UCA") met with document vendors "**MARCOS**" and **"CHILANGO."** Discussions were held regarding the purchase of counterfeit documents for three additional individuals who desired employment at Pilgrim's Pride in Mount Pleasant, Texas. **"CHILANGO"** confirmed his ability to assist UCA D. Ramirez (SAN) in procuring the counterfeit documents for a fee of $1,000 and a $200 finder's fee for each set. **"CHILANGO"** informed UCA D. Ramirez (SAN) that he could obtain the counterfeit documents necessary to obtain employment at Pilgrim's Pride as well as the other counterfeit documents not usable at Pilgrim's Pride. **"CHILANGO"** presented a set of counterfeit documents to UCA D. Ramirez (SAN) that were immediately available for purchase. **"CHILANGO"** advised UCA D. Ramirez (SAN) that the **Human Resources Department employees at Pilgrim's Pride** know of the counterfeit documents and assist in the employment process. **"CHILANGO"** stated that if the SSAN purchased is confirmed by the Human Resources Department to be invalid, a second set of counterfeit documents will be provided at no additional cost. "**CHILANGO"** further stated to UCA D. Ramirez (SAN) that if a person is terminated due to a bad SSAN, no questions are asked by **Pilgrim's Pride Human Resource personnel** when that same person returns with different documents under a different name and SSAN.

26. On May 11, 2007, **"CHILANGO"** provided UCA D. Ramirez (SAN) with two contact telephone numbers [**(903) 767-8860** and **(903) 577-8297**] and his residence address of **2201 North Edwards, Apartment 108, Mount Pleasant, Texas.** **"CHILANGO"** then told UCA D. Ramirez (SAN) that his true identity is **Daniel TOTOSAUS RODRIGUEZ.**

---

1 In this investigation, three ICE Special Agents, each with the last name "Ramirez," participated. For clarity, they

**"CHILANGO"** stated that he has a bank account in the name of **Daniel T. RODRIGUEZ.** **"CHILANGO"** also mentioned to UCA D. Ramirez (SAN) that his work name (at Pilgrim's Pride) was **ALBERTO MORALES**. **"CHILANGO"** stated to UCA D. Ramirez (SAN) that the payroll checks issued to him by Pilgrim's Pride are deposited into the bank account under the name of **Daniel T. Rodriguez**. During discussions with **"CHILANGO"** about acquiring the three (3) sets of identity documents, UCA D. Ramirez (SAN) asked **"CHILANGO"** if he would need to provide names and dates of birth for the documents. **"CHILANGO"** responded that UCA D. Ramirez (SAN) did not have to provide that information and that he (**"CHILANGO"**) would "take care of it." **"CHILANGO"** stated that he assisted approximately 20-26 people with obtaining jobs at the Pilgrim's Pride Plant in Mount Pleasant, Texas using counterfeit documents and that "**MARCOS**" helps him.

27. On May 12, 2007, the CI received a call from "**MARCOS**" with notification that the counterfeit documents ordered for the CI had been received. The CI met with **"MARCOS,"** at the Goodwill Store near Interstate 30 in Mt. Pleasant, Texas, at which time **"MARCOS"** personally handed the CI a white envelope with "Acta, Seguro ID de TX de 45 a 48, Ivan, Fecha: 12-27-59, "Tommy Chavez" handwritten on the front of the envelope. Enclosed in the white envelope was a Texas Identification Card # 18200844 bearing the name of Chavez, Tommy Martin, 4433 Vidaurri Ave Apt 35, Laredo, Texas 78041. The ID card listed the date of birth as 12-27-1959, with an expiration date of 12-27-2010. "**MARCOS**" stated that his wife had spoken with **Pilgrim's Pride Human Resource Representative "VILLARREAL"** in order to set up a meeting on either Monday, May 14, 2007, or Tuesday May 15, 2007.

---

are designated by their office, e.g., "SAN" for San Antonio, "ELP" for El Paso, and "PHX" for Phoenix.

28. On May 14, 2007, the CI made a consensually monitored phone call to "MARCOS" regarding a meeting with **"VILLARREAL,"** who is a **Human Resource employee at Pilgrim's Pride**. "MARCOS" stated that he would be meeting with "VILLARREAL" regarding an appointment at Pilgrim's Pride for the purpose of obtaining employment for the CI. The CI and **"MARCOS"** discussed the meeting arrangements with **"VILLARREAL"** along with the bribe amount of $500 to be paid to **"VILLARREAL"** and a $100 finder's fee to **"MARCOS." "MARCOS"** stated that **"VILLARREAL"** knows that the documents currently used by **"MARCOS"** are bad documents. **"MARCOS"** stated to the CI that he is currently working under the name of **"MARCOS GARCIA MENDOZA."**

29. On May 14, 2007, "**MARCOS**," driving a **Red Dodge Durango, Texas License plate 157 MKF,** picked up the CI and drove to the **Pilgrim's Pride Human Resources Division** located on **1107 Monticello Street, Mount Pleasant, Texas**. The CI obtained and completed a job application form, as instructed by **"MARCOS,"** using the identity on the fraudulent identity documents purchased from "**MARCOS**." The application, bearing the fraudulent identity of Tommy CHAVEZ, was completed in anticipation of providing the job application to **Pilgrim's Pride Human Resources employee Reyna VILLAREAL** during a meeting that was being arranged by "**MARCOS.**"

30. On May 15, 2007, an undercover operation was conducted at the **Pilgrim's Pride Human Resource Department located at 1107 Monticello, Mount Pleasant, Texas** involving a meeting with **"VILLARREAL."** The CI and "**MARCOS**" arrived at 11:30 a.m., as previously arranged between "**MARCOS**" and "**VILLARREAL.**" The CI engaged **"VILLARREAL"** in a conversation regarding employment at Pilgrim's Pride. **"VILLARREAL"** requested the

identification documents from the CI who handed **"VILLARREAL"** the white envelope containing all of the counterfeit documents purchased from "**MARCOS**." The CI advised **"VILLARREAL"** that these were the documents obtained from "**MARCOS**." **"VILLARREAL"** removed all documents from the envelope and took possession of the Social Security card and Texas identification card. During this meeting between **"VILLARREAL"** and the CI at Pilgrim's Pride, the CI mentioned to **"VILLARREAL"** that **'MARCOS"** had arranged the meeting. **"VILLARREAL"** acknowledged the prearranged meeting with "**MARCOS**" which took place the evening of May 14, 2007. The conversation between the CI and **"MARCOS"** revealed that **"MARCOS"** is married to the niece of **"VILLARREAL."** **"VILLARREAL"** proceeded to electronically enter the SSAN into an unknown computer system. **"VILLARREAL"** then immediately stated to the CI that the documents "look good to me." **"VILLARREAL"** then informed the CI that he was hired and he was offered a position with Pilgrim's Pride on the sanitation crew. The CI then completed miscellaneous employment documents. **"VILLARREAL"** then instructed the CI to return to Pilgrim's Pride on May 16, 2007, for an eight hour, new employee orientation and told the CI that he would commence employment at Pilgrim's Pride at 0001 hours on May 18, 2007. After departing the Human Resource Department, the CI paid **"MARCOS"** $100, as previously agreed.

31. On May 22, 2007, an undercover meeting took place at a warehouse in Fort Worth, Texas, between **"CHILANGO"** and ICE UCAs based on several undercover phone calls on May 18-22, 2007, between "**CHILANGO"** and UCA D. Ramirez (SAN). During these calls, arrangements were made for the purchase of a set of fraudulent identity documents. "**CHILANGO"** arrived at the warehouse driving a **primer gray colored Jeep Comanche**

**pickup truck, Texas License plate 08M VT4.** "**CHILANGO**" entered the warehouse and greeted UCAs D.Ramirez (SAN) and Guerra. "**CHILANGO**" was handed an envelope containing a $600.00 initial payment from UCA D. Ramirez (SAN). "**CHILANGO**" was also provided a set of six (6) photographs of UCA Guerra, which were to be utilized for the fraudulent identity documents. "**CHILANGO**" and the UCAs discussed how a job is procured at Pilgrim's Pride, including getting the fraudulent documents and filling out a job application at Pilgrim's Pride. "**CHILANGO**" reasserted that the UCAs would "not have any problem" getting a job at Pilgrim's Pride with the fraudulent documents that were being purchased. "**CHILANGO**" told the UCAs that "everybody" knows what's going on. UCA Guerra provided CHILANGO with a contact telephone number for future business transactions.

32. On June 7, 2007, UCA Guerra and "**CHILANGO**" met at a restaurant in Mount Pleasant, Texas, for the purpose of finalizing the fraudulent document purchase. "**CHILANGO**" exited his vehicle, a **primer gray colored Jeep Comanche, Texas License Plate 08M-VT4,** and entered UCA Guerra's vehicle. UCA Guerra and "**CHILANGO**" departed the restaurant parking lot and proceeded to the Pilgrim's Pride plant at **1107 Monticello Road in Mount Pleasant, Texas.** UCA Guerra then paid "**CHILANGO**" the remaining balance of $600 for the purchase of the counterfeit documents. "**CHILANGO**" exited the vehicle and entered through a security turnstile by utilizing his identification card for the purpose of picking up a set of counterfeit documents. After approximately fifteen minutes, "**CHILANGO**" exited the Pilgrim's Pride plant through the entrance turnstiles and returned to the vehicle to speak with UCA Guerra.

33. On June 7, 2007, while "**CHILANGO**" and UCA Guerra were parked at the Pilgrim's Pride Plant at approximately 1:22pm, "**CHILANGO**" received a call on his cellular

phone from his supervisor, later identified as **Bartolo "HERNANDEZ," (hereinafter "HERNANDEZ")** and was asked what he was doing at the plant. "**CHILANGO**" told "**HERNANDEZ**" that he was at the plant looking at documents. UCA Guerra and surveillance agents were able to overhear portions of the telephone conversation while "**CHILANGO**" was on the phone call. In the conversation, "**CHILANGO**" was overheard referring to the caller as "Jefe" (Boss). Also, in the cellular conversation, "**HERNANDEZ**" was heard asking CHILANGO "what are you doing here". CHILANGO and "**HERNANDEZ**" also were heard speaking about "Marcos Garcia". Subsequent to the phone call, "**CHILANGO**" informed UCA Guerra that it was his supervisor on the phone and asked UCA Guerra if he saw his supervisor as they passed him in the Pilgrim's Pride parking lot. This information was confirmed through electronic recording and monitoring of the undercover operation. Also, existing PEN Register data was analyzed and indicated an outgoing cellular telephone call from the number (903) 767-5638 ("**HERNANDEZ**") to phone number (903) 767-8860 (Daniel RODRIGUEZ aka "**CHILANGO**") placed at 1:23pm on June 7, 2007. "**CHILANGO**" and UCA Guerra spoke at length concerning Pilgrim's Pride, the plant, the total number of employees, and the fact that many supervisors in the plant know what is going on concerning fraudulent identity documents.

34. On June 7, 2007, "**CHILANGO**" and UCA Guerra departed the Pilgrim's Pride plant and proceeded back to the restaurant parking lot where "**CHILANGO**" got back into a **Gray Jeep Comanche, Texas License Plate 08M-VT4**. Both UCA Guerra and "**CHILANGO**" departed the parking lot and proceeded to "**CHILANGO's**" apartment located at the **2201 N. Edwards #108, Mount Pleasant, Texas.** During the conversation within the apartment, "**CHILANGO**" stated that a male and a female are responsible for procuring the fraudulent

documents that UCA Guerra was attempting to purchase through **"CHILANGO."** **"CHILANGO"** stated that some individuals who have obtained the fraudulent identity documents use the identification to procure credit cards. **"CHILANGO"** told UCA Guerra that all individuals who obtain fraudulent identity documents gain employment at Pilgrim's Pride by posing as United States citizens through the use of the fraudulent documents.

35. On June 7, 2007, **"CHILANGO"** provided UCA Guerra with a birth certificate and Social Security card in the name of Martin IZQUIERDO while in **"CHILANGO'S"** apartment located at **2201 N. Edwards Apt 108, Mt. Pleasant, Texas**. **"CHILANGO"** stated that there are many women that work at Pilgrim's Pride, and that **"CHILANGO"** has the ability to obtain fraudulent sets of identity documents for females as well. **"CHILANGO"** told UCA Guerra to refer to fraudulent documents as "Pantalones" (Spanish word for "pants") for a male set of fraudulent identity documents, and "Faldas" (Spanish word for "skirt") for a female set of fraudulent identity documents during future conversations.

36. On June 15, 2007, UCA Guerra arrived at **2201 N. Edwards #108, Mount Pleasant, Texas,** for an undercover meeting and met with **"CHILANGO"** for the purpose of picking up a set of counterfeit documents previously ordered by UCA Guerra. **"CHILANGO"** provided UCA Guerra with a Social Security card, California identification card and a birth certificate. The Social Security card bearing number 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, in the name of Hector M. CENICEROS, appeared to be a genuine document. The California identification card bearing the number N8945467, also in the name of Hector Mario CENICEROS, listed an address of 228 S. Maple Ave., Montebello, California 90640. The birth certificate bearing # 2314563276523, provided to UCA Guerra by **"CHILANGO,"** indicated that it was issued in the State of

California, County of Los Angeles. The birth certificate also listed the name of Hector Mario Ceniceros, with a date of birth of September 8, 1961. **"CHILANGO"** instructed UCA Guerra to obtain his own identification card that could be obtained locally for the purchase price of $120.

37. On June 15, 2007, UCA Guerra paid **"CHILANGO"** $1,000 for counterfeit documents in the name of Martin IZQUIERDO provided to UCA Guerra during a previous meeting for the purpose of selling the documents. **"CHILANGO"** provided UCA Guerra with a blank Pilgrim's Pride employment application obtained from his (**"CHILANGO's"**) **Gray Jeep Comanche, Texas License Plate 08M-VT4.** **"CHILANGO"** instructed UCA Guerra to complete the application with the information listed on the counterfeit documents provided to UCA Guerra listed above. **"CHILANGO"** advised UCA Guerra that he could use his (**"CHILANGO's"**) address on the application.

38. On June 18, 2007, UCA Guerra arrived at **"CHILANGO's"** apartment located at **2201 N. Edwards #108, Mount Pleasant, Texas,** and presented **"CHILANGO"** with a counterfeit California identification that was obtained locally by UCA Guerra as instructed by **"CHILANGO"** during a previous meeting. **"CHILANGO"** stated to UCA Guerra that the document was of great quality. **"CHILANGO"** began to go over the Pilgrim's Pride application for employment completed by UCA Guerra. UCA Guerra and **"CHILANGO"** departed **"CHILANGO's"** apartment and proceeded to the Pilgrim's Pride Human Resource Division. **"CHILANGO"** escorted UCA Guerra to the Pilgrim's Pride Human Resource Division located at **1107 Monticello Road, Mount Pleasant, Texas,** to submit the application for employment. UCA Guerra was asked for a second reference and **"CHILANGO"** instructed UCA Guerra to add him (**"CHILANGO"**). Pilgrim's Pride HR personnel reviewed the application and began to

complete paperwork for UCA Guerra's employment. UCA Guerra was asked if he was born in the United States or naturalized. UCA Guerra responded that he was born in Mexico. The HR employee then told UCA Guerra that he could not hire him without a Resident Alien Card or employment authorization.

39. On June 18, 2007, after departing the Human Resource Division, UCA Guerra placed a call to **"CHILANGO"** informing him that he was turned away for not having a Resident Alien Card or work authorization. UCA Guerra was asked by **"CHILANGO"** if "**VILLARREAL**" had conducted the interview. UCA Guerra responded that he did not interview with "Reyna" and that it was a tall Hispanic male. **"CHILANGO"** stated that something had changed and that he would find out why there was a problem when he reported to work in the evening. **"CHILANGO"** later called UCA Guerra and asked him why he told the Human Resource employee that he was born in Mexico. **"CHILANGO"** stated to UCA Guerra that he was suppose to tell them that he was born in the United States, which was the purpose of the counterfeit birth certificate. **"CHILANGO"** informed UCA Guerra that he wanted to meet early in the morning to go back to the HR office and get somebody else to do the interview.

40. On June 19, 2007, UCA Guerra arrived at the apartment of **"CHILANGO"** located at **2201 N. Edwards # 108, Mount Pleasant, Texas,** where UCA Guerra picked up **"CHILANGO"** and proceeded to **Pilgrim's Pride Human Resource Division at 1107 Monticello Rd, Mount Pleasant, Texas**. UCA Guerra was informed by HR personnel that they could not see him due to an interview cutoff and to come back on Thursday. UCA Guerra and **"CHILANGO"** then departed the office and drove back to **"CHILANGO's"** apartment where **"CHILANGO"** stated that he would obtain the telephone number for his boss. UCA Guerra

observed **"CHILANGO"** place a call to his boss, who had previously been identified, as discussed elsewhere in this affidavit, as **"HERNANDEZ"** (hereinafter **"HERNANDEZ"**). **"CHILANGO"** called **"HERNANDEZ"** and asked him to use his influence to get the UCA an interview. **"CHILANGO"** informed **"HERNANDEZ"** that "**VILLARREAL**" was busy training a new employee and that Marta SEGOVIA was working. "**HERNANDEZ"** instructed **"CHILANGO"** to take UCA Guerra back to the HR department and talk to Rebecca DE LA HOYA. The telephone conversation with **"HERNANDEZ"** could be heard by surveillance agents monitoring the undercover operation, including the conversation by **"HERNANDEZ."** According to **"CHILANGO,"** "**HERNANDEZ"** advised **"CHILANGO"** that he (**"HERNANDEZ"**) would place a call to Personnel and have UCA Guerra interviewed. On the return trip to the HR office, **"CHILANGO"** told UCA Guerra to mention to the HR employee that **"HERNANDEZ"** said that everything was "ok" for the interview to be conducted. UCA Guerra and **"CHILANGO"** returned to the HR office and UCA Guerra was called for an interview. UCA Guerra was advised by HR that his Texas driver's license did not appear to be genuine and that he would need to obtain a new identification document prior to being offered employment.

41. On June 20, 2007, UCA Guerra met with **"CHILANGO"** at **2201 N. Edwards # 108, Mount Pleasant, Texas,** for the purpose of continued negotiations regarding fraudulent document purchases and returning the documents (under the name of CENICEROS) previously purchased by UCA Guerra. The documents were returned as part of the guarantee that if documents purchased do not work for employment at Pilgrim's Pride, they will be replaced at no additional cost. **"CHILANGO"** and UCA Guerra continued negotiations regarding the fees to

be charged for additional counterfeit documents. **"CHILANGO"** stated that he needed $1000 for the documents and $100 for himself. UCA Guerra would also be receiving $100 for counterfeit documents arranged and sold through UCA Guerra. **"CHILANGO"** stated that he would need $600 in hand when documents are ordered. **"CHILANGO"** also stated that he had another counterfeit document contact that is from the Brownsville, Texas, area. **"CHILANGO"** stated that the counterfeit documents purchased through his Brownsville contact cost a total of $600.00. **"CHILANGO"** also told UCA Guerra that he does not like to be crossed and that he will kill someone if he is betrayed.

42. On June 20, 2007, **"CHILANGO"** departed **2201 N. Edwards # 108, Mount Pleasant, Texas,** with UCA Guerra and proceeded to the staged temporary residence of UCA Guerra located at Colonial House #34, 101 W. 16th, Mount Pleasant, Texas. Upon arrival at room #34, **"CHILANGO"** was introduced to UCA D.Ramirez (ELP) and discussions were also held regarding the purchase of counterfeit documents by UCA D.Ramirez (ELP). **"CHILANGO"** explained the process of procuring the counterfeit documents and explained the guarantee for the documents. **"CHILANGO"** stated that other documents were available at a cheaper price but that the documents provided by him **("CHILANGO")** were guaranteed with a job at Pilgrim's Pride. **"CHILANGO"** attempted to place a telephone call to his counterfeit document vendor contact **"FETCH"** and attempted to read his phone number on his address list. **"CHILANGO"** asked UCA Guerra to read the telephone number. **"CHILANGO"** handed UCA Guerra a **blue phone list** that contained numerous telephone contacts. UCA Guerra read out the number of **(903) 575-1380** as **"CHILANGO"** punched the numbers into his cellular phone. **"CHILANGO"** made contact with **"FETCH"** and began asking as to the availability of

counterfeit documents in the age range of 40 years of age. **"CHILANGO"** stated that **"FETCH"** was currently in possession of counterfeit documents for a 37 year old male. **"CHILANGO"** gave UCA D.Ramirez (ELP) specific instructions to make sure to tell the person at Pilgrim's Pride that he is a United States citizen. **"CHILANGO"** also instructed UCA D.Ramirez (ELP) to memorize his name and SSAN. Negotiations were held between UCA Guerra, **"CHILANGO"**, and UCA D.Ramirez (ELP) and it was agreed that a total of $1200 would be paid for an additional set of counterfeit documents for UCA J.Ramirez, (PHX).

43. On June 20, 2007, **"CHILANGO"** stated to UCA Guerra that the Pilgrim's Pride HR representative **"ARTURO" or "MARTA"** called **"HERNANDEZ"** and informed him (**"HERNANDEZ"**) about what happened on UCA Guerra's interview. CHILANGO stated that UCA Guerra said he was from Mexico and explained accurate details of the interview. **"CHILANGO"** stated that his boss **"HERNANDEZ"** can accommodate UCA D.Ramirez (ELP) once he is employed.

44. On June 21, 2007, ICE Agents conducted an undercover operation in which a meeting was scheduled with **"CHILANGO"** for the purpose of picking up the set of fraudulent documents for UCA J.Ramirez, (PHX). ICE UCA Guerra arrived in the Pilgrim's Pride employee parking lot in order to meet with **"CHILANGO."** **"CHILANGO"** came out of the Pilgrim's Pride plant and approached the UCA as he sat in a vehicle parked in the employee parking lot. **"CHILANGO"** entered the vehicle with UCA Guerra, at which time UCA Guerra counted out twelve one hundred dollar bills (totaling $1,200.00). Of the $1,200.00, UCA Guerra paid **"CHILANGO"** a total of $1,100.00, and pocketed a $100.00 bill to convince **"CHILANGO"** that UCA Guerra was taking his cut for the purchase of the fraudulent

documents. **"CHILANGO"** exited the vehicle and proceeded back inside the Pilgrim's Pride plant in order to retrieve the set of fraudulent documents, which had just been paid for in the vehicle. After re-entering the Pilgrim's Pride plant, **"CHILANGO"** subsequently exited the access gates of Pilgrim's Pride and came back into the employee parking lot. **"CHILANGO"** proceeded back to the vehicle to meet with UCA Guerra. Once inside the vehicle with UCA Guerra, **"CHILANGO"** provided him with a set of identity documents bearing the name "Carlos Alberto Navarro." The set of identity documents included a California State birth certificate in the name of Navarro, birth date October 30, 1970 (37 years of age), and a Social Security card bearing the number 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, also on the name of Navarro.

45. On June 27, 2007, ICE Agents conducted an undercover operation at the Pilgrim's Pride Human Resources Department in Mount Pleasant, Texas. Over the course of several days between June 27 and July 3, 2007, at the Human Resources Department of Pilgrim's Pride, UCA Somers acquired employment within Pilgrim's Pride. On July 3, 2007, while UCA Somers was waiting in the Human Resources Department, UCA Somers overheard someone asking for **"VILLAREAL"** and heard that someone had gotten a job through **"VILLAREAL."** UCA Somers attended an eight hour New Hire Orientation session on July 4, 2007. UCA Somers began employment at Pilgrim's Pride on July 5, 2007.

46. On July 3, 2007, an undercover operation was conducted at the Pilgrim's Pride Human Resources Department located at **1107 Monticello Rd, Mount Pleasant, Texas**. UCA J.Ramirez, (PHX) went inside the Human Resources Department in order to check on the status of possible employment after having previously completed an employment application. As UCA J.Ramirez, (PHX) was leaving the building, he encountered two individuals who were engaged in

discussion. One individual, described as a Hispanic male, 5'4" tall, approximately 55 years of age, wearing a Pilgrim's Pride shirt with the name "Pedro" on it, was speaking with another Hispanic male. Based on what was overheard by UCA J.Ramirez, (PHX), "Pedro" spoke of employment at Pilgrim's Pride. "Pedro" asked the Hispanic male if **"HERNANDEZ"** had sent him to gain employment. The Hispanic male explained that **"HERNANDEZ"** had sent him. The Pilgrim's Pride employee "Pedro" responded "Yeah, you'll get a job."

47. On July 4, 2007, ICE Agents conducted an undercover operation at the Pilgrim's Pride Human Resources Department in Mount Pleasant, Texas. ICE UCA Somers arrived at the Pilgrim's Pride Human Resources Department for New Hire Orientation. UCA Somers informed ICE Agents that there appeared to be numerous re-hires of previous employees. UCA Somers stated that during the orientation presented by ZAMORA, Zamora would greet some of the new hires and ask questions such as "Where are you now," and "How have you been."

48. On July 4, 2007, UCA J.Ramirez, (PHX) arrived at the Human Resources Department of Pilgrim's Pride located at **1107 Monticello Rd, Mount Pleasant, Texas,** for the purpose of obtaining employment. UCA J.Ramirez, (PHX) stated that while he was sitting in the waiting area of the Human Resources Department of Pilgrim's Pride, two Hispanic females were observed. One of the Hispanic females was named "Leticia Flores." "Flores" was with an acquaintance that appeared to be an employee at Pilgrim's Pride due to the standard work attire. UCA J.Ramirez, (PHX) stated that the name and information being used by "Flores" was gathered when he looked over at the identity documents in her possession. UCA J.Ramirez, (PHX) stated that "Flores" was in possession of a miniature birth certificate or birth registration card in the name of "Leticia Flores", with the date of birth of April 30, 1985. UCA J.Ramirez,

(PHX) recalled that the female companion of "Flores" was walking around to the various offices within the Human Resources Department and was bringing "Flores" with her to speak with **"VILLARREAL."** UCA J.Ramirez, (PHX) observed that "Leticia Flores" was called by a H.R. employee. The female companion of "Flores" nudged "Flores" with her elbow to indicate that she should respond to the name. Both "Flores" and the female companion proceeded into **"VILLARREAL's"** office. Several minutes later, both individuals came out of **"VILLARREAL's"** office and "Leticia Flores" was told by a Human Resources employee sitting up front that she would need to be back the following day for Orientation.

49. On July 5, 2007, UCA SOMERS started her shift at Pilgrim's Pride at approximately 3:15 p.m. UCA SOMERS noticed that the plant employs a disproportionately large number of Hispanics and that very little English is used inside the plant. UCA SOMERS engaged in a conversation with a Hispanic female named "Rosa." Rosa stated that she has worked at the plant for twelve years. UCA SOMERS asked Rosa if all the employees were United States citizens and Rosa stated that they are not. Rosa said that the HR office would not hire you unless you have good papers. If your papers are bad they will not tell you that you cannot be hired, they just say you need "good papers." Rosa stated that one could return with a different set of "good papers" and be hired.

50. On July 6, 2007, UCA SOMERS reported to work at Pilgrim's Pride as scheduled. UCA SOMERS spoke with Maria Hernandez, an employee at the plant, who stated that 70 employees were fired last week and 40 employees were fired this week for "bad" papers. UCA SOMERS witnessed a male employee being escorted out by security during her shift. UCA SOMERS also observed three additional employees escorted out of the plant and being

terminated.

51. On July 9, 2007, UCA SOMERS reported to work at Pilgrim's Pride as scheduled. UCA SOMERS stated that she met individuals who have worked at the Pilgrim's Pride Plant for several years, who do not speak, read, or write English.

52. On July 9, 2007, ICE Agents met with Pittsburg Chief of Police Martin Pessink at his request. Chief Pessink requested help from ICE Agents regarding an ongoing problem in Pittsburg, Texas, involving a subject by the name of Sergio Berrera, who is reportedly producing and distributing counterfeit identity documents. Chief Pessink stated that he had an informant who would provide him with information that Sergio Berrera was producing these documents for illegal aliens. Chief Pessink also advised that he is receiving, on average, a request every week from law enforcement agencies in the Southern California area for assistance investigating stolen identities from their jurisdiction being utilized by subjects who show to be employed at Pilgrim's Pride in the Pittsburg, Texas, area. Chief Pessink requested assistance from ICE Agents on this matter, as he has no undercover officers, equipment, or funding to conduct this investigation.

53. On July 10, 2007, UCA SOMERS reported to work at Pilgrim's Pride as scheduled. UCA SOMERS observed low employee attendance within the plant and was placed on a different production line due to decreased production. UCA SOMERS estimates that 80 percent of all employees are of Hispanic descent and that three individuals are of Middle Eastern descent. UCA Somers observed that most employees do not speak during work and, generally, when conversation is overheard, it is primarily in the Spanish language.

54. On July 10, 2007, ICE Agents conducted an undercover operation at the residence of **"CHILANGO"**, located at **2201 N. Edwards #108, Mount Pleasant, Texas.**

**"CHILANGO"** and UCA Guerra engaged in conversation for several minutes in which **"CHILANGO"** informed UCA Guerra that it has become more difficult to gain employment at Pilgrim's Pride. **"CHILANGO"** stated that he (**"CHILANGO"**) heard from a **Human Resources employee** that when UCA Guerra had attempted to gain employment at Pilgrim's Pride utilizing the fraudulent identity documents purchased from **"CHILANGO"**, UCA Guerra could not recite his birth date correctly and did not seem to know the information listed on the documents. **"CHILANGO"** stated that this caused suspicion with the Human Resources employees at Pilgrim's Pride, and therefore UCA Guerra did not receive a job. UCA Guerra and **"CHILANGO"** discussed the purchase of additional fraudulent documents, as well as **"CHILANGO's"** document vending associates with connections to California. **"CHILANGO"** stated that his contact is the person who has connections to California. **"CHILANGO"** and UCA Guerra discussed various fraudulent documents schemes, and discussed how to arrange for shipment and payment of documents through shipping providers such as DHL, and wire transfers into bank accounts for payments. **"CHILANGO"** spoke about his contact **"FETCH"** who maintains connections with California. **"CHILANGO"** stated that **"FETCH"** procures and sells approximately thirty (30) sets of fraudulent identity documents per month. **"CHILANGO"** stated that of the 30 sets procured by **"FETCH"**, **"CHILANGO"** purchased four (4) in the recent month and that **"FETCH"** has other clients.

55. On July 10, 2007, UCA Guerra and **"CHILANGO"** departed the residence at **2201 N. Edwards #108, Mount Pleasant, Texas,** and drove to a gas station in order to meet with **"FETCH"** and retrieve a set of counterfeit documents. At the gas station, **"CHILANGO"** walked up to a **Lincoln Towncar, Texas License Plate X03-NZS,** and entered the vehicle.

**"CHILANGO"** subsequently exited the Towncar and with a set of papers in his hand. The vehicle registration revealed the vehicle to be a 1998 Lincoln 4-door registered to Maria Del Socorro **MORAN, 6096 Highway 271, Mount Pleasant, Texas.** **"CHILANGO"** walked back to the vehicle of UCA Guerra and presented UCA Guerra with the purchased counterfeit documents including a State of California birth certificate #0190-112232, Social Security card # 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, and California identification card #B4712865, all of which bear the name of Marcos Gonzalez ZAMORA, with a date of birth of October 8, 1975. **"CHILANGO"** told UCA Guerra that there were auditors from the government at Pilgrim's Pride Human Resource Division, and that UCA Guerra should stay away from Pilgrim's Pride for now. **"CHILANGO"** told UCA Guerra that Pilgrim's Pride is removing all individuals from employment with counterfeit or "bad" documents.

56. On July 11, 2007, UCA SOMERS reported to work at Pilgrim's Pride as scheduled. UCA SOMERS engaged in conversation with Pilgrim's Pride employee ROSA BARRIENTES-Cruz, who indicated that things are not going well at Pilgrim's Pride and that many people with "bad" documents are being terminated. BARRIENTES relayed to UCA SOMERS that two "immigration people" are reviewing everyone's documents.

57. On July 12, 2007, UCA J.Ramirez, (PHX) submitted an employment application to Pilgrim's Pride Human Resources Department. UCA J.Ramirez, (PHX) was asked by a Human Resources Department representative if he was already working at the plant because his SSAN was being utilized. UCA J.Ramirez, (PHX) was advised that he would have to get a verification letter from Social Security to be employed.

58. On July 13, 2007, ICE Agents continued undercover operations at the Pilgrim's

Pride Human Resources Department in Mount Pleasant, Texas. UCA SOMERS talked to 8 or 9 employees about banking. Most of the individuals spoken to by UCA SOMERS indicated that they did not have bank accounts at Pilgrim's Bank. Three people said they were "extranjeras" (foreigners) and that they do not use bank accounts.

59. On July 16, 2007, UCA SOMERS reported to work at Pilgrim's Pride as scheduled. According to UCA SOMERS the word among the employees within the plant was that Pilgrim's Pride has terminated numerous employees for having "bad documents." Employees were being called at home and instructed to report to the Human Resources Department where they were then terminated. UCA Somers spoke with a female employee, who informed UCA Somers that she had a friend who had been "laid off." The female employee remarked that "if you've got the right papers, you can come back."

60. On July 17, 2007, ICE Agents conducted an undercover operation in Mount Pleasant, Texas. UCA Guerra arrived at the residence of **"CHILANGO"** located at **2201 North Edwards Road #108, Mount Pleasant, Texas**. UCA Guerra inquired as to the replacement fraudulent identity documents still owed to UCA Guerra. **"CHILANGO"** stated that the document vendors currently do not have documents for the appropriate age. **"CHILANGO"** stated that "they" have identity documents for "underage" individuals, but no identity documents for UCA Guerra's age. **"CHILANGO"** also stated that he saw the "document vendors" at work the previous night, and **"CHILANGO"** made a signal to them to see if they had received the documents. The "document vendors" signaled that they did not receive the documents. **"CHILANGO"** stated that he would ask "them" again when he sees them at work.

61. On July 19, 2007, UCA Somers reported for work at the Pilgrim's Pride Plant in

Mount Pleasant, Texas. UCA Somers stated that the production lines in the Pilgrim's Pride Plant appeared to be approximately half-staffed. Camilo PEREZ, who had been working as a line foreman, was reportedly being fired on Saturday July 21, 2007, for not having genuine employment documents. According to UCA Somers, PEREZ had prior employment at Pilgrim's Pride and had been previously released. PEREZ had reportedly worked at Pilgrim's Pride for ten (10) years and had been through termination for bad documents before.

62. On July 27, 2007, ICE Agents conducted an undercover operation at the residence of **"CHILANGO"** located at **2201 N. Edwards #108, Mount Pleasant, Texas.** **"CHILANGO"** entered a bedroom in the apartment and reappeared shortly thereafter holding two (2) envelopes. **"CHILANGO"** presented the envelopes to UCA Guerra. UCA Guerra stated that each envelope contained a set of fraudulent identity documents. UCA Guerra took possession of one of the sets of identity documents from CHILANGO. The documents were in a white envelope with the word "German" on the front side. The identity documents which were provided to UCA Guerra contained a California State birth certificate in the name of Herman Gray, DOB: June 18, 1960. Also contained in the set of identity documents was a Social Security card in the name of Herman Gray, SSAN 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. UCA Guerra asked **"CHILANGO"** about the additional second set of documents that **"CHILANGO"** had brought out from a bedroom in the apartment. **"CHILANGO"** pulled the identity documents from the envelope and stated to UCA Guerra that the documents are from 1974, 1975, or 1976. UCA Guerra stated that he was unsuccessful in obtaining the money for the second set of documents. **"CHILANGO"** stated that he would give the documents back to **"FETCH"** since UCA Guerra could not come up with the money at the present time. UCA Guerra asked **"CHILANGO"** if he

would wait before giving the second set of identity documents back to the document vendors. **"CHILANGO"** stated that "they" might want to sell the documents to someone else before Sunday. **"CHILANGO"** stated "if someone shows them money, they'll sell them."

63. On July 30, 2007, ICE Agents conducted an undercover operation involving **"CHILANGO"** at **2201 N. Edwards #108, Mount Pleasant, Texas**. During the meeting, UCA Guerra paid **"CHILANGO"** $1,100.00 for a set of fraudulent identity documents. **"CHILANGO"** provided the set of identity documents in a white envelope. Inside the white envelope was a California State birth certificate in the name of Luis F. Gutierrez, DOB: January 18, 1974. Also included in the set of identity documents was a Social Security card in the name of Luis F. Gutierrez, SSAN 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.

64. On July 30, 2007, UCA Guerra placed a phone call to **"CHILANGO"** in order to confirm that the meeting was still scheduled. **"CHILANGO"** informed UCA Guerra that he had recently returned from the residence of Reyna "**VILLARREAL**." **"CHILANGO"** stated that while at the **"VILLARREAL"** residence, he spoke with **"VILLARREAL's"** husband due to Reyna being out of town. **"CHILANGO"** stated that **"VILLARREAL's"** husband is also employed at Pilgrim's Pride. **VILLARREAL's"** husband told **"CHILANGO"** that things are "slow" at Pilgrim's Pride, and that "they've" fired all the "extranjeros." **"VILLARREAL's"** husband also stated that "no one is getting in right now because of what's going on" at Pilgrim's Pride. **"CHILANGO"** also conveyed to UCA Guerra that **"VILLARREAL'S"** husband also sells fraudulent identity documents. **"CHILANGO"** stated that **"VILLARREAL"** would still assist in obtaining UCA Guerra employment at Pilgrim's Pride.

65. On July 30, 2007, **"CHILANGO"** had a discussion with UCA Guerra about a

downstairs neighbor in the Oak Manor Apartment complex, who supposedly is also in the business of selling fraudulent identity documents. **"CHILANGO"** stated that the neighbor gets fraudulent identity documents from Brownsville, Texas. **"CHILANGO"** claimed that the identity documents procured by the downstairs neighbor are of the same type of identity documents procured by **"CHILANGO"** through **"FETCH,"** but that the documents are from Brownsville, Texas, and not California. **"CHILANGO"** claims that the downstairs neighbor would sell the fraudulent identity documents to CHILANGO for approximately $600-$700. **"CHILANGO"** wanted UCA Guerra to observe the meeting and the neighbor, and then decide whether or not **"CHILANGO"** and UCA Guerra should do further business with the neighbor.

66. On July 30, 2007, **"CHILANGO"** stated to UCA Guerra that he **"CHILANGO"** met with the fraudulent document vendor to procure two sets of identity documents purchased by UCA Guerra on 7/27/07 and 7/30/07. **"CHILANGO"** stated that while he was meeting with the document vendor **"FETCH"**, he (**"CHILANGO"**) witnessed another individual who was procuring seven (7) sets of fraudulent identity documents. **"CHILANGO"** claimed that vendors have "really nice cars," to include vehicles similar to Cadillac Escalades. **"CHILANGO"** also stated that "they" do not keep the "really nice cars" at the house. **"CHILANGO"** further stated that the **Gold Lincoln Towncar, Texas License Plate X03NZS,** is usually driven by the wife of **"FETCH."**

67. On July 30, 2007, ICE surveillance Agents observed a navy blue **Pickup truck,** with a custom painted image on the rear tailgate, arrive at **6096 Hwy 271,** driven by a Hispanic male of approximately 40 years of age, who was wearing a striped short sleeved shirt and tan colored shorts. The Agents believed this person to be **"FETCH."** Following the undercover

meeting with **"CHILANGO"**, UCA Guerra departed the area. Approximately ten (10) minutes after the meeting was terminated, the same **Gold Lincoln Towncar, Texas License plate X03NZS,** arrived at the Oak Manor Apartment complex located at **2201 N. Edwards #108, Mount Pleasant, Texas.** A Hispanic male believed to be "**FETCH"** who appeared to be approximately 40 years of age, who was wearing a striped short-sleeved shirt and a pair of tan colored shorts, was observed exiting the **Gold Lincoln Towncar**. The Hispanic male was then observed by ICE Agents going up the stairs to **"CHILANGO's"** apartment.

68. On August 9, 2007, UCA Guerra conducted an undercover consensually monitored phone call to **"CHILANGO's"** home phone number of **(903) 577-8297. "CHILANGO"** stated to UCA Guerra that **"CHILANGO"** had spoken with **"VILLARREAL"** recently. **"CHILANGO"** stated that **"VILLARREAL"** informed **"CHILANGO"** that she does not want to get involved in getting anybody employment at Pilgrim's Pride at the moment. According to **"CHILANGO," "VILLARREAL"** stated that there were "government people" at the Human Resources Office, and that those "government people" were checking every application for employment. **"VILLARREAL"** also supposedly told **"CHILANGO"** that the "government people" should be at the Human Resources Office for approximately two (2) more months. According to **"CHILANGO," "VILLARREAL"** is not trying to obtain employment for anyone based on the "government people's" presence in the Human Resources Office. **"CHILANGO"** also informed UCA Guerra that **"VILLARREAL"** spoke about the hiring process going back to "normal" once the "government people" leave.

69. A review of personnel records provided by Pilgrim's Pride indicated that **"VILLARREAL"** prepared and submitted an application for employment dated 07/20/2000

under the name of Reyna C. **ALEMAN**. **"VILLARREAL"** listed her SSAN as 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 on the application for employment and claimed prior employment at Mastercraft, Ind., 1106 Industrial Road, Mount Pleasant, Texas, from 07/31/1996 to the date of the application, 07/20/2000. According to Immigration & Naturalization Service (INS) records, **"VILLARREAL"** was initially granted employment authorization (I-688-B A79 555 179) on 08/14/2002, valid until 08/14/2003. The prior employment with Mastercraft, Ind. listed by **"VILLARREAL"** was obtained prior to receiving lawful employment authorization by the INS.

70. **"VILLARREAL"** was subsequently employed by Pilgrim's Pride effective 07/31/2000 under the name of Reyna C. **ALEMAN** with SSAN 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. On 7/28/2000, **"VILLARREAL"** prepared and submitted to Pilgrim's Pride, IRS Form W-4 under the name of Reyna ALEMAN, using fraudulently obtained SSAN 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.[2] On 06/04/2002, **"VILLARREAL"** submitted another IRS Form W-4 under the name of **ALEMAN** using SSAN 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 while employed with Pilgrim's Pride. **"VILLARREAL"** obtained employment with Pilgrim's Pride without authorization from the INS.

71. On 07/28/2000, **"VILLARREAL"** completed the Form I-9, Employment Eligibility Verification form (Form I-9) under the name of Reyna **ALEMAN**, dob: 08/22/1974, using SSAN 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. **"VILLARREAL"** falsely claimed on the Form I-9, under penalty of perjury, that she was a citizen or national of the United States. **"VILLARREAL"** presented Texas Driver's License # 03161498 and fraudulently obtained SSAN 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 for the purpose of obtaining employment at Pilgrim's Pride.

---

2 The true owner of the SSAN 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 has been identified as Randy Mullis, who was interviewed by ICE agents in Tiffin, OH. Mullis indicated that he had obtained the SSAN in Alabama in 1974. He was not aware that anyone else was using his SSAN, nor had he ever authorized anyone else to use his SSAN.

72. On 10/07/2002, **"VILLARREAL"** prepared and submitted an application for employment with Pilgrim's Pride under the name of Reyna **"VILLARREAL"** using SSAN 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. When questioned on the application whether, she had previously worked at Pilgrim's Pride, **"VILLARREAL"** answered by writing "no" in the space provided. **"VILLARREAL"** claimed prior employment with Mastercraft, Ind., 1106 Industrial Drive, Mount Pleasant, Texas, from 09/1994 until July 2000. **"VILLARREAL"** failed to indicate on the application that she was employed at Pilgrim's Pride from 07/31/2000 through the date of her application.

73. On 10/18/2002, Pilgrim's Pride personnel records revealed that **"VILLARREAL's"** employment records were recreated after voluntarily resigning from personnel clerk position # 16824, under the name of Reyna **ALEMAN,** effective 10/21/2002. Subsequent to the voluntary resignation, **"VILLARREAL"** was rehired under the name of Reyna **"VILLARREAL,"** effective 10/22/2002 into personnel clerk position # 17548 under the supervision of Hope ANGUIANO. The records reflecting the rehire also changed the use of SSAN 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 to a new SSAN of 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.

74. On 10/18/2002, **"VILLARREAL"** prepared and submitted Form I-9 under the name of Reyna **"VILLARREAL,"** dob: 08/22/1974 using SSAN 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. **"VILLARREAL"** attested on the Form I-9 that she was an alien authorized to work until 08/14/2003 under alien registration number A79 555 179. **"VILLARREAL"** presented an Employment Authorization Document (EAD) bearing # A79 555 179, issued by the Immigration Service as proof of employment eligibility. The Form I-9 indicated that the employment authorization for **"VILLARREAL"** was updated and re-verified by Pilgrim's Pride on 08/13/2003, valid until 08/14/2004. **"VILLARREAL"** also prepared and submitted IRS Form

W-4 under the name of **"VILLARREAL"** using SSAN 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.

75. On 08/14/2003, a Pilgrim's Pride internal memorandum was created by **HR Director/Manager Hope Anguiano** requesting an adjustment of the date of hire for **"VILLARREAL."** The memorandum explains the fact that VILLARREAL was employed with Pilgrim's Pride since 07/30/2000, and that she initially worked under the name of Reyna ALEMAN using SSAN 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. The document also reflects that the change in employment records were for immigration purposes. The Pilgrim's Pride internal memorandum substantiates the fact that **"VILLARREAL's"** total wages earned during an unspecified year under SSANs 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 and 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 were reported on a single W-2.

76. Department of Labor (DOL) Special Agent Phil Barbour queried Texas Workforce Commission (TWC) records that indicate that **"VILLARREAL"** earned wages while employed by Pilgrim's Pride from 1st Quarter 2001 to 4th Quarter 2002 under SSAN 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.

77. Queries conducted through Accurint database indicated that SSAN 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 was associated with Tony R. Mullis, Date of Birth (DOB) February 11, 1959. There are extensive biographical records for Mullis under this SSAN, which was issued in Alabama between January 1, 1973 and December 31, 1973. On 10/24/2007, Mullis was telephonically interviewed by ICE SA Yvette Rodriguez regarding the use of his SSAN by **"VILLARREAL."** Mullis confirmed that his true SSAN is 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. Mullis advised that he is retired from the United States Air Force, and did not know how anyone else could have obtained his SSAN. Mullis stated that he was unaware that his SSAN had been used by **"VILLARREAL,"** and that he did not authorize the use of his SSAN by **"VILLARREAL."**

78. On 08/14/2003, a Pilgrim's Pride Payroll Change Notice form was completed by **HR Director/Manager Hope Anguiano** that indicated a personnel change for **"VILLARREAL"** from personnel clerk ID #17548 to personnel clerk ID# 16834 within the same job number, job name and department. Reflected in the comments section of the form was that **"'VILLARREAL'** was Reyna **ALEMAN** #812373 using SSAN 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." Also included in the comment section was a note stating to "adjust the hire date to 07/31/00."

79. On 08/15/2003, Pilgrim's Pride Personnel Clerk Martha Segovia provided a verification letter to **"VILLARREAL"** indicating that **"VILLARREAL"** had been employed with Pilgrim's Pride Corporation since 10/21/2002. The verification letter was notarized on 08/15/2003 by **Pilgrim's Pride Human Resource Director/Manager, Hope Anguiano.** This letter was submitted to the INS as a part of an application process.

80. On 11/12/2003, "**VILLARREAL**" prepared and submitted Form I-9 under the name of Reyna **"VILLARREAL,"** dob: 08/22/1974 using SSAN 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. **"VILLARREAL"** claimed that she was a Lawful Permanent Resident (LPR) under alien registration number A79 555 179. **"VILLARREAL"** presented INS document I-551 as proof of employment eligibility.

81. A review of **"VILLARREAL's"** Immigration and Naturalization Service (INS) Alien file (AFILE) 079 555 179, revealed that **"VILLARREAL"** claimed to be born in Mexico. Included in the AFILE was a Mexican birth certificate for **Reyna ALEMAN-CHAVEZ**, born in Guerrero, Mexico on August 22, 1974. **"VILLARREAL's"** AFILE indicated that **"VILLARREAL"** had first attempted to gain valid immigration status based on an I-130 petition from her sister, Sandra ALEMAN-CHAVEZ in the year 2001. **"VILLARREAL's"**

application remained on an approximate 10 year waiting list in a pending status.

82. On January 21, 2002, additional documents were submitted by **"VILLARREAL"** to the INS which included Service Form G-325A (Biographic Information). The Form G-325A dated on January 21, 2002 was prepared and signed by **"VILLARREAL." "VILLARREAL"** neglected to provide information indicating that she was employed by Pilgrims Pride in Mt. Pleasant, Texas. Form G-325A clearly indicates that severe penalties are provided by law for knowingly and willfully falsifying or concealing a material fact.

83. INS Form I-485 (Application to Register Permanent Resident or Adjust Status) was submitted to INS by **"VILLARREAL"**. This document was signed, under penalty of perjury, by "VILLARREAL" on January 21, 2002. **"VILLARREAL"** claimed on Form I-485 to maintain a current occupation of Housewife. An internal Pilgrims Pride Corporation memorandum specifically indicates that at the time Form I-485 was signed by **"VILLARREAL"** on January 21, 2002, **"VILLARREAL"** had actually been employed at Pilgrims Pride since July 30, 2000 under the name Reyna **"ALEMAN." "VILLARREAL"** had obtained this employment by falsely claiming to be a U.S. citizen and fraudulently using SSAN 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.

84. On INS Form I-485 dated January 21, 2002, **"VILLARREAL"** answered "No" to Part 3 Question 1a "Have you ever, in or outside the U.S. knowingly committed any crime of moral turpitude…for which you have not been arrested?" and "No" to Part 3 Question 10 "Are you under a final order of civil penalty for violating section 274C of the Immigration and Nationality Act for use of fraudulent documents or have you, by fraud or willful misrepresentation of a material fact ever sought to procure or procured, a visa, other documentation, entry into the U.S. or any immigration benefit?" **"VILLARREAL"** withheld

the facts that she was gainfully employed at Pilgrim's Pride without employment authorization from the INS, while using a fraudulently obtained SSAN, and false claiming to be a United States citizen.

85. On July 10, 2005, Immigration Form I-751 (Petition to Remove Conditions on Residence) was prepared and submitted to INS by **"VILLARREAL"**. **"VILLARREAL"** claimed in question number seven (7) that she had never committed any crime for which she had not been arrested. This document was completed, signed, and submitted to INS under penalty of perjury subsequent to **"VILLARREAL's"** unauthorized use of Social Security number 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, a crime for which she had not been arrested.

86. On August 15, 2006, **"VILLARREAL"** submitted and certified under penalty of perjury, Form N-400 (Application for Naturalization) to INS. Question 6B of the N-400 specifically states to report all employment during the previous 5 years. **"VILLARREAL"** provided employment information at Pilgrims Pride starting on October 22, 2002, and failed to report her employment status at Pilgrims Pride from July 2000 until October 21, 2002. According to information obtained by affiant, the Form N-400 was mailed from Mt. Pleasant, in Titus County.

87. On the N-400 application, **"VILLARREAL"** responded in the negative to the question "Have you ever claimed to be a U.S. Citizen (in writing or any other way)." **"VILLARREAL's"** negative response contradicts the Employment Eligibility Verification Form (I-9) signed by **"VILLARREAL"** at Pilgrims Pride in July of 2000. On the I-9 signed by **"VILLARREAL"** in July of 2000, **"VILLARREAL"** utilized the fraudulently obtained SSAN 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 and **"VILLARREAL"** claimed to be a United States Citizen in order to gain

unlawful employment at Pilgrims Pride.

88. On the N-400 application, **"VILLARREAL"** was questioned if she "had ever committed a crime for which you were not arrested?" **"VILLARREAL"** responded in the negative, which contradicts her actions in the unauthorized use of a SSAN 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, as well as the crime of False Claim to United States Citizenship.

89. On the N-400 application, **"VILLARREAL"** was questioned if she had "ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" **"VILLARREAL's"** withholding of the material facts mentioned above constitutes a willful misrepresentation to Immigration Officials in order to obtain immigration benefits during each of the I-485, I-751 and N-400 processes.

90. On January 24, 2007, **"VILLARREAL"** appeared before an Immigration official for a face to face interview. **"VILLARREAL"** was placed under oath prior to the interview by Adjudication Officer E. Caez. **"VILLARREAL"** re-affirmed that all the information and evidence provided by **"VILLARREAL"** was true and correct to the best of her knowledge and belief. The interview and complete review of all the information submitted by **"VILLARREAL"** was conducted. **"VILLARREAL"** willfully withheld material facts and failed to disclose all of the aforementioned facts.

91. On August 10, 2007, ICE UCAs met with **"CHILANGO"** at **2201 N. Edwards #108, Mount Pleasant, Texas,** for the purpose of purchasing two sets of counterfeit identity documents. During the meeting, **"CHILANGO's"** land line telephone **(903-577-8297)** in **"CHILANGO's"** apartment rang. **"CHILANGO"** was witnessed by UCA Guerra picking up

the telephone for the land line house phone and answering the incoming call. When **"CHILANGO"** answered the incoming call, **"CHILANGO"** greeted a person named **"FRETCH" or "FETCH" or "FLETCH"** on the other end of the telephone call. Shortly after the phone call concluded, **"CHILANGO"** and UCA Guerra exited the apartment and drove to the Pilgrim's Pride plant located at **1107 Monticello, Mount Pleasant, Texas**. UCA Guerra and **"CHILANGO"** drove to the small parking lot by the employee turnstile at the Pilgrim's Pride plant located on **1107 Monticello Road, Mount Pleasant, Texas. "CHILANGO"** had the UCA drive him to the Pilgrim's Pride, Mount Pleasant Chicken Processing Plant. After arriving at the employee parking lot outside of the Pilgrim's Pride plant in Mount Pleasant, Texas, UCA Guerra produced $2,200.00 and gave the money to **"CHILANGO"** as payment for the identity documents. **"CHILANGO"** took the $2,200.00, exited the vehicle, and entered the Pilgrim's Pride plant through an employee turnstile. Several minutes later, **"CHILANGO"** returned from inside the Plant and met with UCA Guerra. **"CHILANGO"** entered the vehicle with UCA Guerra and produced two (2) sets of identity documents, which had just been paid for with the $2,200.00. **"CHILANGO"** showed the two sets of identity documents to UCA Guerra, and provided the sets to UCA Guerra. Inside one white envelope was a California State birth certificate in the name of Frank CERNA, DOB: May 15, 1985. Also included in the set of identity documents was a Social Security card in the name of Frank CERNA, SSAN 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, and a photocopy of a California State Driver's License in the name of Frank CERNA, license number D4919152. Inside the second envelope was a California State birth certificate in the name of Luis Manuel MARROQUIN, DOB: August 26, 1985. Also included in the set of identity documents was a Social Security card in the name of Luis Manuel MARROQUIN,

SSAN 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.

92. On November 28, 2007, ICE SAC Dallas Agents conducted surveillance on several possible target locations of individuals involved in the fraudulent document vending scheme and other related offenses at Pilgrims Pride. ICE SAC Dallas Agents D. Popp and G. Ramirez participated in the surveillance. At approximately 11:00am, ICE Agents observed the residence of suspected fraudulent document vendor and confirmed identity theft violator, **"FETCH,"** located at 6096 Hwy 271, Mt. Pleasant, Texas. The ICE Agents observed that the previously observed Gold Lincoln **Towncar** with tinted windows bearing Texas License Plate **X03-NZS** driven by **"FETCH,"** was parked directly in front of the front porch of the residence. This vehicle was the same vehicle observed previously during a fraudulent document purchase with **"CHILANGO."** All observations indicate that **"FETCH"** currently resides at this residence.

93. On November 28, 2007, ICE Agents Popp and Ramirez also observed the residence of Jose Luis **"GARCIA,"** at **404 Church Street, Mt. Pleasant, Texas**. Observed in the driveway of the residence was the same white and red **Lincoln Towncar bearing Texas LP P77-FDN**, seen on previous surveillance efforts. Records indicate that **"GARCIA"** is the property owner of the residence located at **404 Church Street, Mt. Pleasant, Texas.** All observations indicate that **"GARCIA"** currently resides at this residence.

94. On November 28, 2007, ICE Agents Popp and Agent Ramirez observed the Oak Manor apartment complex located at **2201 North Edwards Road #108, Mt. Pleasant, Texas.** Observations indicate that **"CHILANGO"** still resides in the apartment. Telephonic contact with **"CHILANGO'S"** roommate at **(903)577-8297** by ICE UCA D. Guerra indicated that

**"CHILANGO"** is currently working the day shift at Pilgrims Pride. Telephone number (903)577-8297 was previously confirmed to be located within apartment #108 with **"CHILANGO"** as the subscriber.

95. On December 3, 2007, ICE SAC Dallas Agents conducted an undercover operation in Mt. Pleasant, Texas. At approximately 7:19pm, ICE UCA'S Guerra and D. Ramirez knocked on the apartment door of **"CHILANGO"**, located at **2201 N. Edwards #108, Mt. Pleasant, Texas. "CHILANGO"** answered the door and invited UCA Guerra and D. Ramirez into his apartment. After initial entry into **"CHILANGO's"** apartment, UCA'S Guerra and D. Ramirez spoke cordially with **"CHILANGO"** and spoke about **"CHILANGO's"** employment at Pilgrims Pride. **"CHILANGO"** stated to UCA'S that he was still working the evening shift, and was going into work at Pilgrims Pride at 8:30pm.

96. **"CHILANGO"** stated that he had to drop his cellular telephone because he could no longer afford to pay the cellular phone bill. **"CHILANGO"** stated that his landline phone number was still connected and working. **"CHILANGO"** continued to speak about his employment at Pilgrims Pride, and informed the ICE UCA'S that he worked on the evening shift for four (4) nights per week, earning a pay of $440.00 per week. **"CHILANGO"** informed UCA'S that he had recently purchased a new car. **"CHILANGO"** stated he bought a Ford Escape Sport Utility Vehicle. ICE Surveillance Agents observed a dark green Ford Escape SUV parked in front of **"CHILANGO'S"** apartment building bearing Texas License plate **9HC JO1.**

97. UCA Guerra engaged **"CHILANGO"** in conversation concerning a previous negotiation for UCA Guerra to "bring" people from the border and provide them with identity documents. UCA Guerra asked **"CHILANGO"** if he would be able to obtain six (6) sets of

identity documents as previously purchased through **"CHILANGO"** and co-conspirator **"FETCH." "CHILANGO"** stated that it would not be a problem to obtain the documents. **"CHILANGO"** continued to state that although he has not purchased any documents from "them" recently, **"FETCH"** is still in the business of providing identity documents to individuals seeking employment at Walmart and the "Builders Mart".

98. After **"CHILANGO"** conveyed that it would not be a problem to get the six (6) sets of identity documents, UCA Guerra requested to receive two (2) sets for females from 25-30 years of age, and four (4) sets for males, ages 30-40 years of age. **"CHILANGO"** stated that the company (Pilgrims Pride) is still not hiring anyone, and therefore business has been slow. **"CHILANGO"** agreed to arrange for the documents to be obtained for UCA Guerra.

99. UCA Guerra asked **"CHILANGO"** if he would need money for the documents up front. **"CHILANGO"** responded that it would be good to have some money up front in order for "them" to know that UCA Guerra "means business," and to provide **"FETCH"** a down payment for the six (6) sets of identity documents. ICE UCA Guerra produced $2,500.00 and counted out the money in front of **"CHILANGO." "CHILANGO"** was handed $2,500.00 for the down payment of six (6) sets of identity documents. UCA Guerra stated that he would need to retrieve the documents sometime during the week of December 10, 2007.

100. During conversation with **"CHILANGO"**, **"CHILANGO"** asked UCA Guerra if UCA Guerra could obtain an ounce of Cocaine for **"CHILANGO." "CHILANGO"** stated that he wanted UCA Guerra to obtain the cocaine for him so that he could sell it and make some money. At approximately 7:49pm, UCA'S Guerra and D. Ramirez departed **"CHILANGO's"** apartment and left the area.

101. At approximately 7:53pm, after the conclusion of the undercover operation, ICE Agent S. Riels observed a dark green Ford Escape pull out of the parking space in front of **"CHILANGO's"** apartment building. SSA Riels observed the Ford Escape turn left out of the Oak Manor Apartment complex and drive toward Highway 271.

102. At approximately 7:59pm, SSA Conklin and Callen observed the dark colored Ford Escape arrive at the residence of **"FETCH,"** located at 6096 Highway 271, Mt. Pleasant, Texas. **"CHILANGO"** and **"FETCH"** spoke on the front porch of **"FETCH's"** home for several minutes, and were observed during this time by ICE Agents Conklin and Callen. ICE Agents were able to confirm that **"FETCH"** was still the occupant of the residence when they saw him at the front door talking to **"CHILANGO."**

103. During the course of this investigation, a list of SSANs generated from the Basic Pilot Program (BPP) was obtained by ICE Dallas from the U.S. DHS Citizenship and Immigration Services (CIS) office. The BPP is a system that allows employers to input SSANs provided by employment applicants as part of an employment eligibility verification process. The list obtained from CIS contained a total of approximately 1100 SSANs of individuals who applied for employment with Pilgrim's Pride. The 1100 SSANs were individually queried through various computer indices, such as Accurint, Lexis/Nexis, and Autotrack. The computer queries revealed information that aided in the detection of possible fraudulent activity and the identification of the true SSAN ownership. An analysis of this information was sent to the Department of Labor ("DOL") and the Federal Trade Commission ("FTC") for further research.

104. The FTC queried the Consumer Sentinel Program (CSP) for the purpose of identifying individuals who had reported their SSANs stolen with documented usage of the

SSAN within the Pittsburgh and Mount Pleasant, TX areas. This CSP query revealed that 30 individuals had reported that their identity had been stolen. The 30 names and SSANs were sent to the DOL for further research, which verified the current employment of the 30 individuals at Pilgrim's Pride in Mount Pleasant and Pittsburg, Texas.

105. Investigation to date has revealed that 30 individuals are involved in identity theft through the unauthorized use of SSANs. The aforementioned investigation revealed that numerous fraudulent documents used to gain unlawful employment at Pilgrim's Pride were issued in California as part of a document vending scheme.

## III. INVESTIGATION CONDUCTED TO DATE

106. Throughout the course of this investigation, various investigative methods have been used to obtain information and evidence relating to the activities of **"CHILANGO"** and his co-conspirators. Such methods have included undercover operations with the use of a confidential informant and undercover agents, pen registers, and physical surveillance.

### A. CONFIDENTIAL INFORMANT (CI)

107. Since approximately April of 2007, a **CI** has provided information to ICE related to the counterfeit document vending activities of **"CHILANGO"** and his co-conspirators. The information has been corroborated to the extent possible by independent investigation and proven to be true in all material respects. On this basis, Affiant believes that the **CI** is a reliable source of information and that his information is credible.

### B. SURVEILLANCE OPERATIONS

108. On numerous occasions during the course of this investigation, ICE Agents and other investigators in this case conducted surveillance and undercover operations, which corroborated

information, provided by the referenced CI, five (5) UCAs, and other investigative reports. Observations by surveillance Agents/Officers have established that the persons and residences, which are the subject of this application for arrest and search warrants are related to the counterfeit document organization and the unlawful employment.

## IV. PROBABLE CAUSE FOR ARREST AND SEARCH WARRANTS:

109. The Search Warrants sought are for residences, vehicles, and businesses and such locations as are more particularly described in **"Attachment A."**

110. The scope of each Search Warrant includes the named property, residence, business, and all outbuildings, storage containers, and vehicles located on the curtilage of the location and the specific items delineated in **"Attachment B."**

111. The following are the requested search locations with their addresses and the probable cause establishing the foundation for each search warrant application (each location is more particularly (physically) described in **"Attachment A"**):

**A. Arrest of Daniel TOTOSAUS-Rodriguez aka: "CHILANGO", Alberto MORALES**
**Search of:**
1. **Workspace and Locker of Daniel TOTOSAUS-Rodriguez located within the Pilgrim's Pride Chicken Processing Facility, 1107 Monticello Road, Mount Pleasant, Texas; and**
2. **Residence at 2201 N. Edwards # 108, Mount Pleasant, Texas**
3. **Ford Escape Sport Utility Vehicle bearing Texas License plate 9HC JO1**

112. In support of this application to arrest **Daniel Totosaus-Rodriguez aka: "CHILANGO", "Alberto Morales"** and to search the above described locations, this Court is respectfully directed to the information detailed in paragraphs 1 to 102 above.

113. During the period of June 9, 2007 to September 22, 2007, the cellular phone number (903) 767-8860, belonging to CHILANGO (Daniel RODRIGUEZ), made at least

thirteen (13) phone calls to Bartolo HERNANDEZ' cellular phone number (903) 767-5638. Also during this time period, CHILANGO received at least thirty (30) phone calls from Bartolo HERNANDEZ' cellular telephone number (903) 767-5638.

114. From the period of June 9, 2007 to September 22, 2007, the cellular phone number (903) 767-8860, belonging to CHILANGO (Daniel RODRIGUEZ), made at least twenty-eight (28) phone calls to Bartolo HERNANDEZ' land line number (903) 575-3906 at Pilgrims Pride. Also during this time period, CHILANGO received at least four (4) phone calls from Bartolo HERNANDEZ' landline number (903) 575-3906 at Pilgrims Pride.

115. From the period of June 9, 2007 to September 22, 2007, the cellular phone number (903) 767-8860, belonging to CHILANGO (Daniel RODRIGUEZ), made at least two (2) phone calls to "Marcos GARCIA" at cellular phone number (903) 434-0122.

**B. Arrest of Marcos GARCIA "MARCOS"**

116. In support of this application to arrest **Marcos GARCIA "MARCOS"** this Court is respectfully directed to the information detailed in paragraphs 1 to 102 above.

117. From the period of June 19, 2007 to July 14, 2007, the cellular phone number (903) 434-0122, belonging to Marcos GARCIA (subscribed to by Magaly PARRA, GARCIA'S wife), received at least two (2) phone calls from CHILANGO'S cellular phone number (903) 767-8860.

**C. Arrest of Ivan Damaso aka: "FETCH"**

1. **Search of Workspace and Locker of Ivan Damaso, aka: "FETCH," located within the Pilgrim's Pride Facility, 1107 Monticello Road, Mount Pleasant, Texas;**
2. **Search of residence at 6096 Highway 271, Mount Pleasant, Texas**
3. **Lincoln Towncar, Texas License Plate X03-NZS**

118. In support of this application to arrest **Ivan Damaso aka: "FETCH"** and to search the above described locations, this Court is respectfully directed to the information detailed in paragraphs 1 to 102 above. **IVAN DAMASO; aka "FETCH"**, dob: 08/12/1973, is known to be using SSAN 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. This SSAN was the subject of an identity theft report from El Paso, Texas, on 01/03/2007.

119. From the period September 28, 2007 to October 25, 2007, FETCH'S landline phone number (903) 575-1380 was in communication with Bartolo HERNANDEZ' landline phone number (903) 575-3906 at Pilgrims Pride at least twelve (12) times.

**D. Arrest of Jose Luis GARCIA**

120. In support of this application to arrest **Jose Luis "GARCIA"** and to search the above described locations, this Court is respectfully directed to the information detailed in paragraphs 1 to 102 above.

E. **Arrest of "VILLARREAL", aka: Reyna Aleman, Reyna A. Castro**
**1. Search of workspace and Locker of "VILLARREAL" located within the Pilgrim's Pride Human Resource Division, 1107 Monticello Road, Mount Pleasant, Texas**

125. In support of this application to search the above described location, this Court is respectfully directed to the information detailed in paragraphs 1 to 97 above.

126. On August 29, 2007, UCA Guerra placed an undercover cold call to (903)575-3305, which revealed that the number is the work phone of **"VILLARREAL"** at Pilgrim's Pride Human Resource Division located at **1107 Monticello Road, Mount Pleasant, Texas.**

127. In support of this application to search the above described vehicles, this Court is respectfully directed to the information detailed in paragraphs 1 to 102 above.

**V. <u>Probable Cause For Arrest Warrants</u>:**

128. On January 26, 2007, Dallas ICE agents opened an investigation pertaining to undocumented individuals working at Pilgrim's Pride. During the course of this investigation, a variety of investigative techniques were utilized to provide intelligence information to agents conducting surveillance in the field. In addition, a number of individuals working within the company have been identified as using identification that belong to someone else.

129. During the course of this investigation, a list of SSANs was received from U.S. Central Index System. This list of SSANs was derived from the BPP. The BPP is a program designed to give employers information pertaining to positive matches for SSANs. This list was comprised of potential employees' SSANs checked through the BPP by an authorized employee at the Pilgrim's Pride Plants in Pittsburgh and Mount Pleasant, Texas. This list was subsequently checked though various computer databases in an attempt to identify the individuals who have been assigned the SSANs. Other governmental databases were also utilized to determine if any of the individuals holding the SSANs had ever reported their identity stolen.

130. During this investigation, a number of individuals were identified as having had their identity stolen. This information was corroborated through the assistance of the DOL and Texas Work Force Commission (TWC), which identified the SSANs being used by employees at Pilgrim's Pride. The identities confirmed to have been reported stolen are as follows:

A. **Jane DOE, aka: ALDAPE, ARACELI**, dob: 09/21/1977, using SSAN: 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. LexisNexis reports that this SSAN was issued prior to 09/21/1977. Araceli Aldape of Huntington Park, California, reported on 05/23/2007 that her identity had been stolen. Computer database checks revealed that Aldape is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Aldape's personal information is also

working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that Jane DOE, aka: ALDAPE, ARACELI, presented a Texas Driver's License bearing #20453978 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Department of Public Safety revealed that Texas Driver's License # 20453978 is the driver's license of Michelle D. Perry and not that of Araceli Aldape.

B. **Jane, DOE, aka: MELENDEZ, IGXILA, DIAZ, Ecia,** dob: 05/13/1978, using SSAN: 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. This SSAN was the subject of an identity theft report from Cebia, Puerto Rico, when the true Igxila Melendez of Cebia, Puerto Rico, reported her identity had been stolen. Computer database checks revealed that Melendez is currently identified as residing and working in Puerto Rico. During this same time, the DOL and TWC indicate that indicate that someone using Melendez' personal information is also working at Pilgrim's Pride and living in Mount Pleasant, Texas. On 12/04/2007, SSA F. Torres conducted an interview with Igxia G. Melendez-Diaz in Cebia, Puerto Rico, who stated that she had reported her identification stolen. Melendez-Diaz stated that she had reported her social security card stolen to the SSA. MELENDEZ-Diaz discovered the theft when the Social Security Administration advised her that she had employment records in the United States. MELENDEZ-Diaz stated that she discovered the theft in July 2007 and did file a police report.

C. **Jane DOE, aka: RAMOS, MERCEDES**, dob: 07/30/1966, using SSAN: 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. This SSAN was the subject of an identity theft report from Bronx, New York when the true Mercedes Ramos of Bronx, New York, reported her identity had been stolen. Computer database checks revealed that Mercedes Ramos is currently residing and working in New York.

During this same time, the DOL and TWC indicate that someone using Ramos' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/03/2007, SSA J. Munjone interviewed Ramos in Bronx, New York. Ramos stated that she had reported her identity stolen when she was advised by her medical insurance company in April 2007. Ramos did report the theft to the New York Police Department, IRS and the SSA.

D. **John DOE, aka: ESCALANTE, CARLOS**, dob: 1/11/1967, using SSAN: 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. This SSAN was the subject of an identity theft report from Tucson, Arizona, on 08/21/2006 when the true Carlos Escalante of Tucson, Arizona reported his identity had been stolen. Computer database checks revealed information that Carlos Escalante is currently residing and working in Tucson. During this same time, the DOL and TWC indicate that someone using Escalante's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 02/05/07, SSA H. Lopez contacted Escalante in Nogales, Arizona, who verified that he (Escalante) reported his identity had been stolen. Escalante stated that he discovered the theft in 2005 when he filed his income taxes. Escalante stated that he did report the theft to the Nogales Police Department and the IRS.

E. **John DOE, aka: IVAN DAMASO; aka "FETCH"**, dob: 09/06/1978, using SSAN: 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. This SSAN was the subject of an identity theft report from El Paso, Texas, on 01/03/2007 when Lluvia Damaso, the spouse of the true IVAN DAMASO of El Paso, Texas, reported that this identity had been stolen. An interview with Lluvia Damaso (spouse), revealed that the true Ivan Damaso was deported and is currently residing in Tijuana, Mexico. During this same time, the DOL and TWC indicate that someone using Damaso's personal information is also residing in Mount Pleasant, Texas and working at Pilgrim's Pride in Mount Pleasant. On

August 30, 2007, ICE SAs Lowenberg and Cervera personally interviewed Karina Gardea De Rodriquez in El Paso, Texas. Ms. Rodriquez confirmed that she is the Mother-in-Law of Ivan Damaso. Ms. Rodriquez stated that Ivan Damaso had been deported by the U.S. Government and now lives in Tijuana, Mexico with his wife and children; she did not know why Ivan Damaso had been deported. A record check by ICE confirmed that SSAN 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 did in fact belong to Ivan Damaso who had been deported.

F. **John DOE, aka: BLANQUET, MANUEL**, dob: 12/26/1983, using SSAN: 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. This SSAN was the subject of an identity theft report from San Bernardino, California, when the true Manuel Blanquet reported that his identity had been stolen. Computer database checks revealed that Manuel Blanquet is currently residing in California. During this same time, the DOL and TWC indicate someone using Blanquet's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 11/30/2007, SSA Naranjo conducted an interview of Blanquet, who confirmed that he had reported his identity stolen. Blanquet stated that he became aware of the theft when he was notified by Equifax of someone trying to establish telephone service in his name. Blanquet stated that he was billed by the Internal Revenue Service in the amount of $17,000 caused by the unauthorized use of his SSAN. Blanquet stated that he reported the theft to FTC, IRS and the San Bernardino Police Department.

G. **John DOE, aka: BEDOLLA, YOSERIN**, dob: 9/25/1983, using SSAN: 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. This SSAN was the subject of an identity theft report from San Mateo, California, when the true Yoserin Bedolla reported that his identity had been stolen. Computer database checks revealed information that Yoserin Bedolla is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Bedolla's personal

information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 10/09/2007, SSA D. Alvarez conducted an interview with Bedolla who confirmed that his identity had been stolen. Bedolla stated that he was mugged in Texas and that his identification and SSAN were stolen.

H. **John DOE, aka: ALCON, RONNIE**, dob: 11/01/1970, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Ronnie ALCON reported that his identity had been stolen. Computer database checks revealed information that Ronnie ALCON is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Alcon's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On October 1, 2007 SA Ryan Babcock interviewed Alcon at 4922 Earle Avenue, Rosemead, California regarding the theft of his identity. Alcon stated that his Social Security number is 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 and he provided SA Babcock with a copy of his Social Security card. Alcon stated that he has never lived outside of the Los Angeles, California area, and has never lived in Texas. Alcon stated that he has never worked for Pilgrim's Pride Corporation. Alcon stated that he reported the misuse of his assigned SSA Social Security number 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 to the Federal Trade Commission, the Social Security Administration, IRS, and filed a police report with the Los Angeles County Sheriff's Office.

I. **Jane DOE, aka: CHAVEZ, NORMA**, dob: 03/09/1982, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Norma Chavez reported that her identity had been stolen. Computer database checks revealed information that Norma Chavez is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Chavez' personal information is

also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that Jane DOE, aka: Norma Chavez, presented a Texas Identification Card bearing # 99273846 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Department of Public Safety revealed that Texas Identification Card # 99273846 is not a valid number issued by the State of Texas and there is no record on file.

J. **John DOE, aka: RAMIREZ, ARTURO**, dob: 04/08/1983, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Arturo Ramirez reported that his identity had been stolen. Computer database checks revealed information that Arturo Ramirez is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Ramirez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/04/2007, SSA S. Smiley conducted an interview of Ramirez in Los Angeles, California. Ramirez verified that he had reported his identity stolen after his was notified by the IRS of a bill for $7,000. Ramirez stated that he reported the theft to the IRS.

K. **John DOE, aka: LEARY, JESSIE C.**, dob: 12/12/1984, using SSAN: 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. This SSAN was the subject of an identity theft report from Tucson, Arizona, when the true Jessie Leary reported that his identity had been stolen. Computer database checks revealed information that Jessie Leary is currently residing in Tucson, Arizona. During this same time, the DOL and TWC indicate that someone using Leary's personal information is also residing and working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/05/2007, SSA Y. Rodriguez spoke

with Jessie Leary in Tuscon, Arizona, via telephone. Jessie Leary confirmed that he had reported his identification stolen and had not authorized any other individual to use his SSAN.

L. **John DOE, aka: QUEZADA, OSCAR**, dob: 07/10/1983, using SSAN: 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. This SSAN was the subject of an identity theft report from Montebello, California, when the true Oscar Quezada reported that his identity had been stolen. Computer database checks revealed information that Oscar Quezada is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Quezada's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/04/2007, SSA Y. Magdalena conducted an interview with Quezada who confirmed that his identity had been stolen. Quezada stated that he had his wallet stolen in 2005. Quezada stated that he reported his identity theft to Montebello Police Department.

M. **John DOE, aka: RODRIGUEZ, RENE**, dob: 05/02/1954, using SSAN: 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. This SSAN was the subject of an identity theft report from Las Vegas, Nevada, when the true Rene Rodriguez reported that his identity had been stolen. Computer database checks revealed information that Rene Rodriguez is currently residing in Las Vegas, Nevada. During this same time, the DOL and TWC indicate that someone using Rodriguez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On September 4, 2007, ICE SAs Kalmes II and Dye personally interviewed Rene Rodriguez in Las Vegas, Nevada. Rodriguez confirmed that he is a United States citizen and that his true and correct SSAN is 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. Rodriguez advised the agents that he has never authorized anyone else to use his SS number. He also verified that he reported the theft and use of his identity to the Las Vegas Metropolitan Police Department, among other agencies.

N. **John DOE, aka: ESPINOZA, GUILLERMO**, dob: 05/15/1971, using SSAN: 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. This SSAN was the subject of an identity theft report from Pasadena, California, when the true Guillermo Espinoza reported that his identity had been stolen. Computer database checks revealed information that Guillermo Espinoza is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Espinoza's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. SSA R. Babcock has spoken to the Apartment complex manager who verified that Espinoza currently resides at 1627 N. Fair Oaks Avenue #204B, Pasadena, California, which was also reflected on the FTC theft report.

O. **John DOE, aka: HEREDIA, JUAN**, dob: 12/31/1964, using SSAN: 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. This SSAN was the subject of an identity theft report from Garden Grove, California, when the true Juan Heredia reported that his identity had been stolen. Computer database checks revealed information that Juan Heredia is currently residing and working in Raymondville, Texas. During this same time, the DOL and TWC indicate that someone using Heredia's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/05/2007, SSA Y. Rodriguez contacted Heredia who confirmed that he had reported his identity stolen. Heredia resides in Garden Grove, California.

P. **Jane DOE, aka: PEREZ, TANIA**, dob: 04/28/1968, using SSAN: 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. This SSAN was the subject of an identity theft report from Yonkers, New York, when the true Tania Perez reported that her identity had been stolen. Computer database checks revealed information that Tania Perez is currently residing in New York. During this same time, the DOL and TWC indicate that someone using Perez' personal information is also working at Pilgrim's

Pride in Mount Pleasant, Texas. On 12/03/2007, SSA J. Munjone conducted an interview of Perez who verified that she had reported her identity stolen. Perez stated that she reported the theft to the Federal Trade Commission and to Blue Cross/Blue Shield. Perez stated that she did not authorize her identity to be used by anyone else.

Q. **John DOE, aka: JIMENEZ, BENJAMIN**, dob: 09/14/1973, using SSAN: 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. This SSAN was the subject of an identity theft report from Kissimmee, Florida, when the true Benjamin Jimenez reported that his identity had been stolen. Computer database checks revealed information that Benjamin Jimenez is currently residing and working in Florida. During this same time, the DOL and TWC indicate that someone using Jimenez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 11/30/2007, SSA Devine conducted an interview with Jimenez who verified that his identity had been stolen. Jimenez stated that he became aware of the theft when he was notified by the SSA that he was about to lose his SSA benefits due to current employment. Jimenez stated that he was on disability and was in a nursing home in Illinois at the time that he became aware of the theft.

R. **John DOE, aka: PEREZ, JULIO**, dob: 04/12/1976, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Julio Perez reported that his identity had been stolen. Computer database checks revealed information that Julio Perez is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Perez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/05/2007, SSA G. Dunn conducted an interview with Perez who confirmed that his identity was stolen. Perez stated that his wallet was stolen in 2002. Perez became aware of the theft when he was notified by IRS that he owed

$13,000 in taxes based on employment at 28 different companies. Perez reported the theft to the FTC and Montebello California Police Department.

S. **John DOE, aka: ANSELMO, SERGIO**, dob: 3/27/1981, using SSAN: 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. This SSAN was the subject of an identity theft report from Laredo, Texas, when the true Sergio ANSELMO reported that his identity had been stolen. Computer database checks revealed information that Sergio ANSELMO is currently residing and working in Raymondville, Texas. During this same time, the DOL and TWC indicate that someone using Anselmo's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On September 17, 2007, ICE SA Bryan Wade personally interviewed Caudillo in Laredo, TX. Caudillo confirmed that he is a United States citizen, that his true and correct SSAN is 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 and advised SA Wade that he has never authorized anyone else to use his SS number. Caudillo also stated that he had reported the theft and use of his identity to the Laredo Police Department and other agencies to include the IRS.

T. **John DOE, aka: LOPEZ, JOHN**, dob: 01/30/1982, using SSAN: 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. This SSAN was the subject of an identity theft report from Gardena, California, when the true John Lopez reported that his identity had been stolen. Computer database checks revealed information that John Lopez is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Lopez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/04/2007, SSA R. Babcock conducted an interview of Lopez who confirmed that his identity had been reported stolen. Lopez stated that he resides in Gardena, California and reported the theft to the Gardena California Police Department.

U. **Jane DOE, aka: ALVARENGA, EMERITA**, dob: 02/27/1976, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Emerita Alvarenga reported that her identity had been stolen. Computer database checks revealed information that Emerita Alvarenga is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Alvarenga's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. On 12/04/2007, SSA G. Dunn conducted an interview of Alvarenga who confirmed that her identity was stolen. Alvarenga stated that she learned that her identity was stolen in 2004 when she notified by the IRS. Alvarenga stated that she was mugged in Los Angeles and that her identification card, SSAN, and her immigration work permit were stolen. The theft was reported to the LAPD and the SSA.

V. **Jane DOE, aka: RIVERA, VIRGINIA**, dob: 10/09/1983, using SSAN: 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. This SSAN was the subject of an identity theft report from La Puente, California, when the true Virginia Rivera reported that her identity had been stolen. Computer database checks revealed information that Virginia Rivera is currently residing and working in San La Puente, California. During this same time, the DOL and TWC indicate that someone using Rivera's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that John DOE, aka: RIVERA, VIRGINIA, presented a Texas Driver's License bearing #18697864 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Department of Public Safety revealed that Texas Driver's License # 18697864 is the driver's license of an image photo of an unidentified black male (image taken 03/27/1997) and not that of

Virginia Rivera.

W. **John DOE, aka: BARILLAS, OSCAR JR.**, dob: 02/01/1986, using SSAN: 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. This SSAN was the subject of an identity theft report from Los Angeles, California, when the true Oscar Barillas reported that his identity had been stolen. Computer database checks revealed information that Oscar Barillas is currently residing in California. During this same time, the DOL and TWC indicate that someone using Barillas' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that John DOE, aka: John DOE, aka: BARILLAS, OSCAR JR., presented a Texas Identification Card bearing #00151713 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Department of Public Safety revealed that Texas Identification Card # 00151713 is the driver's license of John Manuel Soto, Jr., and not that of Oscar Barillas, Jr..

X. **John DOE, aka: AGUILAR, LAZARO**, dob: 06/27/1975, using SSAN: 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. This SSAN was the subject of an identity theft report from Dobson, North Carolina, when the true Lazaro Aguilar reported that his identity had been stolen. Computer database checks revealed information that Lazaro Aguilar is currently residing and working in North Carolina. During this same time, the DOL and TWC indicate that someone using Aguilar's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that John DOE, aka: AGUILAR, LAZARO, presented a Texas Driver's License bearing #07483848 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Department of

Public Safety revealed that Texas Driver's License # 07483848 is the driver's license of Dennis Gene Finke and not that of Lazaro Aguilar.

Y. **Jane DOE, aka: TREVINO, ROSEMARY**, dob: 09/28/1984, using SSAN: 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. This SSAN was the subject of an identity theft report from North Little Rock, Arkansas, when the true Rosemary TREVINO reported that her identity had been stolen. Computer database checks revealed information that Rosemary TREVINO is currently residing in California. During this same time, the DOL and TWC indicate that someone using Trevino's personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that Jane DOE, aka: **TREVINO, ROSEMARY**, presented a Louisana Identification Card bearing #9164737 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Louisana State Police Intelligence Unit records revealed that Louisana Identification Card # 9164737 is the driver's license of Jacob Russell Lejune and not that of Rosemary Trevino. Records also indicate that the actual SSAN associated with ID # 9164737 is 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.

Z. **John DOE, aka: GONZALEZ, MOISES**, dob: 08/07/1980, using SSAN: 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. This SSAN was the subject of an identity theft report from Storm Lake, Iowa, when the true Moises Gonzalez reported that his identity had been stolen. Computer database checks revealed information that Moises Gonzalez is currently residing and working in California. During this same time, the DOL and TWC indicate that someone using Gonzalez' personal information is also working at Pilgrim's Pride in Mount Pleasant, Texas. A review of Form I-9, Employment Eligibility Verification, obtained from Pilgrim's Pride revealed that John DOE, aka:

GONZALEZ, MOISES, presented a Louisana Driver's License bearing #9327646 and SSAN 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 in order to satisfy the requirements of the I-9. A records check with the Louisana State Police Intelligence Unit revealed that Louisana Driver's License # 9327646 is the driver's license of Danielle Marie Ross and not that of Moises Gonzalez. Louisana State Police Intelligence Unit records also indicates that SSAN # 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 is the actual SSAN associated with Louisana Driver's License #9327646.

## VI. PEN REGISTER INFORMATION

132. During the period of October 4, 2007 to November 4, 2007, the following phone activity was found for **"HERNANDEZ"** Pilgrim's Pride cellular phone number (903) 767-5638 and the indicated search addresses:

Two (2) outgoing phone calls to (903) 575-1380, **"FETCH,"** subscribed by Maria Moran, "**6096 Highway 271 Mount Pleasant, Texas.**"

One (1) incoming phone call from (903) 575-1380, **"FETCH,"** subscribed by Maria Moran, "**6096 Highway 271 Mount Pleasant, Texas.**"

Two (2) outgoing phone calls to (903) 767-8860, cellular phone subscribed by **"CHILANGO."**

Eight (8) outgoing phone calls to (903) 577-8297, landline subscribed by **"CHILANGO,"** at **2201 N. Edwards #108, Mount Pleasant, Texas.**

Two (2) incoming phone calls from (903) 577-8297, landline subscribed by **"CHILANGO,"** at **2201 N. Edwards #108, Mount Pleasant, Texas.**

134. During the period of June 9, 2007 to September 22, 2007, the following phone activity was found for **"CHILANGO'S"** cellular telephone number (903) 767-8860 and the

indicated search addresses:

Thirteen (13) outgoing phone calls to (903) 767-5638, Pilgrim's Pride cellular phone of **"HERNANDEZ,"** at **1107 Monticello Road, Mount Pleasant, Texas**

Thirty (30) incoming phone calls from (903) 767-5638, Pilgrim's Pride cellular phone of **"HERNANDEZ,"** at **1107 Monticello Road, Mount Pleasant, Texas**

Twenty-eight (28) outgoing phone calls to (903) 575-3906, Pilgrim's Pride landline phone of **"HERNANDEZ,"** at **1107 Monticello Road, Mount Pleasant, Texas.**

Four (4) incoming phone calls from (903) 575-3906, Pilgrim's Pride landline phone of **"HERNANDEZ,"** at **1107 Monticello Road, Mount Pleasant, Texas.**

Two (2) outgoing phone calls to (903) 434-0122, **"Marcos GARCIA".**

135. During the period of September 16, 2007 to October 18, 2007, the following phone activity was found for **"CHILANGO'S"** landline phone number (903) 577-8297 and the indicated search addresses:

Five (5) phone calls between (903) 767-5638, Pilgrim's Pride cellular phone of **"HERNANDEZ"**, at **1107 Monticello Road, Mount Pleasant, Texas,** and (903) 577-8297, CHILANGO landline phone at **2201 N. Edwards #108, Mount Pleasant, Texas.**

One (1) incoming phone call from (903) 575-3906, Pilgrim's Pride landline phone of **"HERNANDEZ,"** at **1107 Monticello Rd, Mount Pleasant, Texas.**

136. During the September 28, 2007 to October 25, 2007, the following phone activity was found for **"FETCH'S"** landline number (903) 575-1380, located at "**6096 Highway 271 Mount Pleasant, Texas**" and the indicated search addresses:

Twelve (12) phone calls between (903) 575-3906, Pilgrim's Pride landline of

**"HERNANDEZ"**, at **1107 Monticello Rd, Mount Pleasant, Texas,** and (903) 575-1380, landline phone of **"FETCH"** at **"6096 Highway 271 Mount Pleasant, Texas.**"

Two (2) phone calls between (903) 767-5638, Pilgrim's Pride cellular phone of **"HERNANDEZ,"** at **1107 Monticello Rd, Mount Pleasant, Texas** and (903) 575-1380, landline phone of **"FETCH," at "6096 Highway 271 Mount Pleasant, Texas.**"

137. During the period of June 19, 2007 to July 14, 2007, the following phone activity was found for "**Marcos GARCIA's**" cellular phone number (903) 434-0122 and the indicated search addresses:

Two (2) incoming phone calls from (903) 767-8860, cellular phone of **"CHILANGO."** During additional undercover operations with **"CHILANGO"**, it was learned that "Marcos GARCIA" had neglected to pay the cellular phone bill for (903) 434-0122. For this reason, additional PEN Register and Phone toll data is unavailable.

## VII. CONCLUSION

138. Affiant, from information obtained from confidential informants, UCAs, surveillance reports, intelligence reported to Affiant by other Special Agents and police officers, reviews of background information gathered concerning subjects of this investigation, and the use of other investigative techniques, believes that the **"CHILANGO"** organization operates a counterfeit document vending operation, which constitutes an illegal enterprise that induces undocumented foreign nationals to obtain employment within the United States in violation of law. Affiant has reason to believe that, **"CHILANGO"**, **"MARCOS"**, **"FETCH"**, **"HERNANDEZ"** and others yet unknown are the central figures in the **"CHILANGO"** Organization, and that they direct and/or coordinate the production, procurement and sale of counterfeit document vending activities along

with others known and unknown, with the cooperation and assistance of numerous associates.

139. Affiant believes, based on the facts and circumstances of this Affidavit, that the premises described above, their surrounding curtilage, and any and all vehicles and outbuildings thereon, contain contraband, fruits of the crime, property designed or intended for use or which is or has been used as the means of committing the criminal offenses identified in this application, and evidence of the illegal activities of **"CHILANGO"** and his co-conspirators, including the items described within **"Attachment B."**

GEORGE RAMIREZ
SENIOR SPECIAL AGENT, ICE
Dallas, Texas

SUBSCRIBED and SWORN before me this 10th day of December, 2007.

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Description of Property to be Searched**

### I. 6096 Highway 271 Mount Pleasant, Texas, Titus County, Texas

Description: a single-family residence that has blue siding with white shutters and a gray composite roof. The front porch has four white porch posts with a white front door faces highway 271. The rear of the residence has a red colored deck with an overhang over the white rear door. Directly behind the residence and on the property is a white trailer with beige trim. The property containing the residence and trailer is located just north of the intersection of Highway 171 and Titus Road 1430. Agents have observed the premises sought to be searched.

### II. 2201 N. Edwards #108, Mount Pleasant, Texas, Titus County, Texas

Description: a multi-family apartment complex with apartment number "108" being located in the first of six red brick apartment buildings within the complex. The red brick buildings have white shutters with a gray composite roof. The number "108" is visible on the front door which is gray in color. The door marked with number "108" is located at the top of the stairs on the right hand side of the building closest to Edwards Street. Officers and agents have observed the premises sought to be searched.

### III. Workspace and Locker of Reyna VILLARREAL located within the Pilgrim's Pride Human Resource Division, 1107 Monticello Road, Mount Pleasant, Texas or at current work location within Pilgrim's Pride, if relocated.

Description: a single story metal structure used as an office building that houses the Human Resources Division. The structure is beige in color with dark brown windows and a dark glass main door with a small beige colored awning. The main door faces North-east into the human resource parking lot with a Pilgrim's Pride logo affixed on the glass. Officers and agents have observed the premises sought to be searched.

### IV. Workspace and Locker of Daniel TOTOSAUS-Rodriguez aka: "CHILANGO", Alberto MORALES located within the Pilgrim's Pride Plant Processing Division, 1107 Monticello Road, Mount Pleasant, Texas or current work location as identified by Pilgrim's Pride Management within Pilgrim's Pride facilities, if relocated.

Description: a single story metal structure used as an office building that houses the Human Resources Division. The structure is beige in color with dark brown windows and a dark glass main door with a small beige colored awning. The main door faces North-east into the human resource parking lot with a Pilgrim's Pride logo affixed to the glass. Officers and agents have observed the premises sought to be searched.

**V. Workspace and Locker of Ivan DAMASO aka: "FETCH" located within the Pilgrim's Pride Plant Processing Division, 1107 Monticello Road, Mount Pleasant, Texas or current work location as identified by Pilgrim's Pride Management within Pilgrim's Pride facilities, if relocated.**

Description: a single story metal structure used as an office building that houses the Human Resources Division. The structure is beige in color with dark brown windows and a dark glass main door with a small beige colored awning. The main door faces North-east into the human resource parking lot with a Pilgrim's Pride logo affixed to the glass. Officers and agents have observed the premises sought to be searched.

**VI. Gold Lincoln Towncar, Texas License Plate X03-NZS**

**VII. Ford Escape Sport Utility Vehicle, Texas License plate 9HC JO1**

**ATTACHMENT B**

## DESCRIPTION OF ITEMS TO BE SEIZED

1. Records, documents, files, ledgers, receipts, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as tapes, cassettes, hard drives or disks, floppy disks, diskettes, compact disks, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other storage medium) relating to the following:

a. the establishment, operation, and maintenance of any counterfeit document vending scheme;

b. domestic and foreign travel (including, but not limited to, tickets, notes, schedules, receipts, and passports);

c. United States currency and financial instruments, the receipt, storage, concealment, expenditure, deposit and transfer of cash and monetary instruments (including books, records, receipts, bank statements and related documents, wire transfers, bank deposit and withdrawal receipts, money drafts, letters of credit, monetary instruments including United States currency, money orders, traveler's checks, cashier's checks, passbooks, bank checks, money wrappers, and safe deposit agreements and keys);

d. the deposit, receipt, transfer, transmittal and/or concealment of cash, monetary instruments and/or funds, as well as the names, identities, addresses, pager numbers and telephone numbers of individuals and/or businesses involved in these activities(including, but not limited to, photographs, address and telephone books, Rolodex indices);

e. indicia of occupancy, residency, rental, and/or ownership of the premises to be searched (including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements and keys);

f. correspondence, currency transaction reports and other records, documents, files, or materials reflecting the receipt, deposit, transfer, transmittal and/or concealment of cash, monetary instruments and/or funds;

2. fax machines and all fax transmissions and confirmations relating to the receipt, deposit, transfer, transmittal and/or concealment of cash, monetary instruments and/or funds;

3. answering machine tapes containing discussions regarding the receipt, deposit, transfer, transmittal and/or concealment of cash, monetary instruments and/or funds; and

4. mail packages, mail receipts, and other items reflecting the domestic and international

transportation of cash, monetary instruments and/or funds through the mails.

5. safes (both locked and unlocked) found in the premises to be searched and any of the above-mentioned items found in those safes;

6. computer systems or computer system components, including, but not limited to, the items listed in subparagraphs 6(a) and 6(b) below, for the purpose of conducting on-site examinations and mirroring of their contents for items listed in paragraph 1(a) through 1(f) above:

a. computers or computer systems, including central processing units, external and internal drives and external and internal storage equipment or media, terminals or video display units, and peripheral equipment such as keyboards, printers, modems or acoustic couplers, and automatic dialers;

b. computer or data processing software or data including, but not limited to: hard disks, floppy disks, diskettes, compact disks, CD-ROMs, DVDs, optical discs, Zip cartridges, magnetic tapes, integral RAM or ROM units, and any other permanent or transient storage device(s);

c. any computing or data processing documentation, including, but not limited to: printed copy, instruction books, notes, papers, or computer programs in whole or in part;

d. passwords and data security devices, including any hardware, software, programming code, or passwords designed to restrict access to or hide computer software, documentation, or data.